2010 Ark. App. 636

**O'Nyssa GRANT, Appellant**

v.

**ARKANSAS DEPARTMENT OF
HUMAN SERVICES,
Appellee.**

No. CA 10–303.

Court of Appeals of Arkansas.

Sept. 29, 2010.

Leah Beth Lanford, Little Rock, for appellant.

Kimberly Boling Bibb, Paragould, Tabitha Baertels McNulty, Little Rock, for appellee.

JOHN MAUZY PITTMAN, Judge.

O'nyssa Grant appeals from a December 22, 2009, order of the Lonoke County Circuit Court terminating her parental rights to her son C.N., born July 22, 2005. On appeal, she argues that there is insufficient evidence to support the circuit court's findings that grounds for termination existed and that termination of her rights was in C.N.'s best interests. We hold that the trial court erred in finding that termination of appellant's parental rights was in the child's best interest, and we therefore reverse and remand.

We review termination of parental rights cases de novo. *Yarborough v. Arkansas Department of Human Services,* 96 Ark. App. 247, 240 S.W.3d 626 (2006). The grounds for termination of parental rights must be proven by clear and convincing evidence. *Id.* When the burden of proving a disputed fact is by clear and convincing evidence, the question on appeal is whether the circuit court's finding that the disputed fact was proven by clear and convincing evidence is clearly erroneous, giving due regard to the opportunity of the circuit court to judge the credibility of the witnesses. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* A heavy burden is placed on the party seeking termination. *Jones v. Arkansas Department of Human Services,* 361 Ark. 164, 205 S.W.3d 778 (2005). This is because termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. *Id.* Nevertheless, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.* Thus, parental rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children. *Id.*

The initial removal in this case was prompted by an incident that occurred on June 9, 2007, when the Arkansas Department of Human Services received a report that Grant was at the Cabot Police Station with C.N. and that she was threatening to harm herself. The police and DHS workers tried unsuccessfully for over three hours to obtain information from Grant. A DHS worker noted in her affidavit that Grant appeared unstable and, as a result, exercised a seventy-two-hour hold on C.N. The circuit court entered an order for emergency custody on June 12, 2007. The court later found probable cause for entry of the emergency order. In the probable-cause order, the court ordered a home study of relatives in Texas for possible placement of C.N.

After an adjudication hearing held on August 6, 2007, the circuit court found that C.N. was dependent-neglected because Grant was mentally unstable and unable to properly care for her son. The court allowed DHS to place C.N. with April Daugherty, a maternal aunt in Texas, in part because Grant had also moved to Texas. Among other things, Grant was ordered to comply with the orders of the court; cooperate with DHS, both in Arkansas and in Texas; obtain and maintain stable housing; obtain and maintain stable employment; take her medications as prescribed; complete parenting classes; complete counseling; participate in mental-health services as recommended; maintain

contact with the case workers; and complete a psychological evaluation and follow all recommendations. Grant was also ordered to pay child support of $25 per week beginning August 10, 2007.

By the time of the February 4, 2008, review hearing, Grant had been hospitalized in the Texas State Hospital and had relocated to El Dorado. The court continued custody of C.N. with the relative in Texas. The court found that Grant had not submitted to a psychological evaluation, and that there was a period when Grant did not attend parenting classes or counseling. She was allowed supervised visitation with C.N., and the goal of the case remained reunification, with a concurrent goal of relative custody, guardianship, or adoption.

Another review hearing was held on April 6, 2008. The court continued custody of C.N. in DHS. However, the court noted that the relative in Texas could no longer maintain C.N. in her home, despite the fact that he was doing well. The goal of the case remained reunification, with a concurrent goal of relative custody, guardianship, or adoption.

A permanency-planning hearing was held in conjunction with a review hearing on June 2, 2008. In the resulting order, the court noted that C.N. had been returned to DHS's custody on May 30, 2008, by April Daugherty, the relative in Texas. The court noted that C.N. could not be returned to Grant, but continued the goal as reunification because Grant had relocated to Arkansas in January 2008 and had been complying with the case plan. There was testimony noted in the court's order that Grant had improved but that there was no indication as to when she would be capable of caring for C.N. Grant was ordered to comply with the orders of the court; cooperate with DHS; obtain and maintain stable housing; obtain and maintain stable employment; take her medications as prescribed; complete parenting classes; complete counseling; participate in mental-health services as recommended; maintain contact with the case workers; and complete a psychological evaluation and follow all recommendations. The court also warned Grant that she needed to demonstrate greater improvement and ability to care for C.N. or the court would have no choice but to change the goal to adoption.

A fifteen-month permanency-planning order was entered on September 5, 2008. The court found that Grant had been complying with the case plan and had been making measurable progress but that she had not yet progressed to the point where she could be reunified with C.N. The court was not convinced that enough progress could be made in a reasonable time to achieve reunification, and therefore found that there was little likelihood that continued reunification services to the family would result in successful reunification. The goal of the case was changed to adoption.

An order terminating the parental rights of Macio Nickleberry, C.N.'s putative father, was entered on January 13, 2009, following a November 24, 2008, hearing. However, the circuit court declined to terminate Grant's parental rights at that time because she had shown significant, measurable progress, finding that, despite some relapses, her medication was stable and her mental condition appeared to be under control and improving. The court ordered DHS to provide further reunification services to Grant and set a seven-month "drop dead" date, after which termination would be ordered if reunification could not be achieved.

Another review hearing was held on May 4, 2009. C.N. remained in the custody of DHS, and Grant was allowed super-

vised visitation. The goal of the case was changed to termination of Grant's parental rights despite the court's finding that, except for her mental stability, Grant was in substantial compliance with the case plan. The court further found that Grant had long-term, serious mental illness and that, despite taking medications and following recommendations, she was still subject to episodic conditions. The court found that no significant measurable progress had been made since the previous order and that it was unlikely that the two months remaining until the previously set "drop dead" date would be sufficient to achieve reunification.

On June 10, 2009, DHS and the attorney *ad litem* filed a joint petition seeking the termination of Grant's parental rights alleging two grounds: that twelve months had passed and appellant failed to remedy the cause for removal, *see* Ark.Code Ann. § 9–27–341(b)(3)(B)(i) *(a);* and that subsequent issues had arisen since removal warranting termination. *See* Ark.Code Ann. § 9–27–341(b)(3)(B)(vii) *(a)*. The petition also asserted that there were no family members ready to serve as possible placements for C.N.

The termination hearing was held on December 10, 2009. O'nyssa Grant testified that, with regard to the incident causing removal, she took C.N. to the police station because she did not want to hurt him or herself. She testified that she had been diagnosed as paranoid schizophrenic, but that she was no longer having any symptoms while she was on her medication. She acknowledged that C.N. had been out of her care for more than half of his life but said that she had supervised visitation with her son in her home every two weeks, that the visitations went well, that her son knew who she was, and that they played and talked with each other. Grant stated that she had some unsuper-

vised visitation in the early part of 2009, and, on one occasion, her son did not want to leave and threw a tantrum. She said that she had a withdrawal episode at that time because she was concerned about her child, and that she had another such episode around the time of the May 2009 hearing. She said that these episodes keep her from communicating with other people but that she had not had any recurrence since May because her medication was changed immediately after that episode.

Grant also stated that she had completed parenting classes and been in counseling most of the duration of this case. She had not had an individual therapist since Dr. Garrett retired but was participating in group therapy. Grant understood that C.N. had been in foster care for over half of his life and she wanted what was best for him. She also asserted that she could care for him. She knew that there were programs to help both her and C.N., who recently had been diagnosed as autistic. Grant agreed that C.N. deserved a stable home and said that she wanted to be the one to provide that home. She said that, if C.N. were returned to her, she would call Patti Redmond or Donna Minor if she needed help or had a problem. She stated that Minor is her mental-health professional and that she sees Minor twice a week.

On cross-examination, Grant attributed the March 2009 episode to being on the wrong medication at the time. That was shortly after she had her first unsupervised visitation with C.N. and C.N. threw a tantrum. Grant stated that, when she is having an episode, she completely shuts down and does not communicate, and she admitted that when so affected she is not able to care for her son. Grant acknowledged that there was no way to predict when she would have an episode but stated that if C.N. were in her care and she felt

the least bit paranoid, she would call someone to come and help her.

Dr. Carol Garrett, a doctor of psychology, testified that she was Grant's therapist until she retired in September 2009. She said she testified at the earlier termination hearing that C.N. could be returned to Grant but could not provide an exact time line as to how long it would take. She said that Grant was doing better in her therapy but was somewhat withdrawn in group therapy. She further testified that Grant's psychotic symptoms had stopped and that Grant was able to live independently, take care of herself, drive a car, buy groceries, keep an apartment, and do other things to be able to care for her son. She stated that Grant was never a threat to C.N., but the stress of court and of not knowing whether she would have custody of C.N. were causing her some problems. Garrett testified that Grant had reached the point at which she could be allowed unsupervised visitation even before the goal of the case plan was changed to termination of parental rights. Garrett believed that Grant could properly care for her son with the appropriate backup. She also said that such backup was available in the form of Grant's family and others.

On cross-examination, Garrett attributed Grant's March episode to the stress of the upcoming court hearing, explaining that Grant had hoped that her son was going to be able to come home with her and was terribly disappointed when she realized that he was not. She acknowledged that Grant was on her medication at the time of the March psychotic episode, but explained that the medication could become less effective during stressful periods. She acknowledged that Grant could not care for her son when having a psychotic episode, but opined that, as long as Grant had a support system, it would be safe for C.N. to be with Grant. Finally, Garrett stated that Grant was going to need training to be able to properly take care of her son in light of his recent diagnosis of autism.

Patricia Redmond, the DHS secondary worker in Union County, testified that she helped provide Grant with transportation and other services and that she had supervised Grant's visitation when necessary. Redmond said that, during her visits with Grant, they discussed Grant's medication, her stability, and the things that she needed to work on. She said Grant had made progress in the case, as evinced by the facts that Grant was taking her medication and had obtained her own housing and transportation. Redmond also described what may have been an episode that led to Grant's hospitalization in April or May 2009. According to Redmond, Grant was always talking about how she wanted to have her son back. Redmond noted that Grant was very nervous and when she became anxious, such as before court, she starts exhibiting symptoms. Redmond opined that, despite the services provided to her, Grant had not progressed to the point where she could have either unsupervised contact with her son or to care for her son in her home.

Glenda Shavers, the adoption specialist, opined that C.N. was adoptable. She said that she ran a search through the system and that fifty-two families were eligible to adopt C.N. However, she then testified that C.N.'s recent diagnosis of autism was not included in the search criteria. Nevertheless, she maintained her opinion that C.N. was adoptable because she believed that all children are adoptable. With specific regard to C.N.'s adoptability in light of his autism, she said that she had one email response to her inquiry regarding eligible families who would consider adopting an autistic child.

Bridgette Austin, the family service worker on the case, testified that DHS has

provided services to Grant since the November 2008 termination hearing. Austin reported that no other family member had contacted DHS about being a possible placement for C.N. Austin gave the department's recommendation that Grant's parental rights be terminated in order for C.N. to have stability in a permanent home. She stated that, from the perspective of a child C.N.'s age, it would be in his best interest to obtain permanency now instead of waiting a few months. According to Austin, C.N. would face potential harm if returned to Grant because she had not been able to care for him for more than two hours without having a breakdown and she was not able to handle him, due to his autism. The diagnosis of autism was made in September 2009, at which time C.N. was moved to a therapeutic foster home because his tantrums were getting worse and his former foster parents could not handle him. Austin said that C.N. had adjusted well to his therapeutic foster home.

On cross-examination, Austin stated that Grant had not had unsupervised visitation because of concerns expressed to her by Patricia Redmond. She testified that C.N. was not able to handle large crowds such as those at sporting events or large stores, and stated that C.N.'s previous foster parent was not interested in adopting him. According to Austin, C.N. had a tantrum during one of his visits with Grant, and, after that, Grant was so stressed that she went into one of her episodes. Austin said it would take a lot of training for a parent to be able to care for C.N., adding that she did not know how long it would take to give Grant such training. Austin said that in her opinion Grant, despite not having an episode for over nine months, was not mentally stable enough to care for C.N. According to Austin, Grant had complied with all the case plan provisions except for achieving mental stability.

Erica Darden, a case worker for Lonoke County DHS, testified that she supervised Grant's visits with her son. She testified that she dropped C.N. off for a visit with Grant in March or April 2009, and, when she picked him up two hours later, Grant was catatonic. She said that C.N. was aware of what was happening and was not wanting to leave Grant that day. According to Darden, Grant and C.N. have bonded and improved their relationship. She described C.N. speaking of his mother and stating that he wanted to visit his mother and not leave her. According to Darden, Grant's home is adequate for a child of C.N.'s age. She stated that she had never had any concerns about the safety of Grant's home. In Darden's opinion, Grant was ready to start unsupervised visitation or to start transitioning him into her home. She added that Grant would need a safety plan for what to do should she have a problem with her medication or if she felt an episode coming on. Darden believed this was feasible because Grant had support from her family and friends. Darden stated that she was aware of the department's recommendation and that the opinions she expressed were not those of the department.

Donna Minor, a mental-health paraprofessional with South Arkansas Regional Health Center in El Dorado, testified that she assisted Grant with medication management and other matters for over a year. Minor stated that Grant was not in individual counseling at that time because the regular therapist had left, but that Grant was attending group therapy and would be assigned a new therapist. She testified that, since the March 2009 episode, Grant had made wonderful progress. Minor said that she had observed the interaction between Grant and her son on several occasions and that Grant's actions were appropriate. Minor described her-

self as a person whom Grant could call anytime that she needed help. She said that she was "very comfortable" that Grant would follow a safety plan and would call someone if she had an episode while C.N. was in her custody. Minor said that Grant would need to continue counseling or therapy for the rest of her life. She also stated that she truly believed Grant had learned coping skills to deal with her situation and that she could handle having C.N. in her custody. On cross-examination, Minor stated that her talking to Grant did not stop Grant from having a meltdown.

The circuit court ruled from the bench and granted the petition for termination. The court found that DHS had proven one ground for termination in that C.N. had been adjudicated dependent-neglected; that he had remained out of Grant's custody for more than twelve months; that DHS had made meaningful efforts to provide rehabilitative services; and that, despite those efforts, the conditions that caused removal had not been remedied. The court also found that C.N. was adoptable and that termination of Grant's parental rights was in C.N.'s best interests. The court's written order was entered on December 22, 2009, and this appeal followed.

Grant argues that there is insufficient evidence to support the finding that termination of her parental rights was in C.N.'s best interest because there was no credible evidence regarding the likelihood that C.N. would be adopted. We agree. It is true that the likelihood of a child's adoption is but one factor for the court to consider in determining the child's best interest. *See McFarland v. Arkansas Department of Human Services*, 91 Ark. App. 323, 210 S.W.3d 143 (2005). The polestar consideration is that termination of parental rights must, after consideration

of all relevant circumstances, be shown to be in the child's best interest. *Id.* We think that the trial court erred in finding that it was.

The child in this case suffers from autism and, like his mother, requires ongoing mental treatment. It is clear that his autism sometimes causes disruptive behavior and, we think, equally clear that this condition was not considered in determining whether he was adoptable. If it were true, as Glenda Shavers opined, that "all children are adoptable," it would not be necessary to consider the adoptability of the child to decide whether termination was in the child's best interest. What is certain from this record is that it has been impossible to even place this child in foster care in the same county as that in which Grant resides, that his foster parents have no interest in adopting him, and that all Ms. Shavers could offer regarding the adoptability of this particular child is that she has had one email contact regarding a person who might be interested in adopting a child suffering from autism.

Adoptablility is merely a consideration and not a requirement, it is true, but it is a consideration that bears strongly on a child's best interest, especially in a case like this where the child is attached to a loving mother who has never volitionally subjected him to harm. Both the mother and the child have mental problems that require more treatment and therapy than has been provided, and we think that their mutual love and affection is something that should not be lightly dismissed considering the child's prospects for happiness and general best interest. Given the dearth of evidence of adoptability, we hold that the trial court clearly erred in finding termination of parental rights to be in the child's best interest. Because we reverse on this point, we need not address the remaining arguments advanced by appel-

lant on appeal. *See Benedict v. Arkansas Department of Human Services*, 96 Ark. App. 395, 242 S.W.3d 305 (2006).

Reversed and remanded.

VAUGHT, C.J., and HART, J., agree.