2011 Ark. App. 423

**Susan MARTIN, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES and Minor Children, Appellees.**

**No. CA 10–1166.**

Court of Appeals of Arkansas.

June 1, 2011.

Leah Beth Lanford, Little Rock, for appellant.

Melissa Bristow Richardson, Jonesboro, for appellees.

WAYMOND M. BROWN, Judge.

On August 17, 2010, the Benton County Circuit Court entered an order terminating appellant Susan Martin's parental rights to her children, D.M., born on May 29, 2007, N.P., born on April 10, 2002, and I.P., born on March 6, 2005.[1] Martin argues that the court erred in terminating her parental rights because the Arkansas Department of Human Services (DHS) failed to meet its statutory obligation to provide her meaningful services in the

---

1. The court also terminated the parental rights of each of the children's fathers; however, the fathers are not the subjects of this appeal.

form of one-on-one parenting classes. We affirm.[2]

DHS took emergency custody of Martin's children on May 8, 2009, after reports of physical abuse to the three children. According to the affidavit, the two boys, N.P. and I.P., both had bruises on their bodies. In a interview, the boys alleged that Martin "gives them 'whoopins' with the paddle." They also alleged that "their 'Papa' made them put a dress on and give them a 'whoopin'." The boys also described how they were called female names while receiving their "whoopins" in the dress. When Martin spoke with the investigator about the allegations, she denied having any knowledge about the bruises. The court granted emergency custody on May 11, 2009. The court found probable cause to continue the children in DHS's custody in an order filed on June 2, 2009. DHS was ordered to arrange a psychological evaluation of Martin.

Dr. Martin T. Faitak performed a psychological evaluation of Martin on June 29, 2009. Martin was diagnosed with attention deficit hyperactivity disorder, learning disabilities, and borderline personality disorder. As a result of the evaluation, Dr. Faitak made the following recommendations: (1) that Martin be seen by a psychiatrist in order to determine if medication would be useful in helping to stabilize her mood, (2) that Martin receive hands-on parenting because her attention and learning problems would make it difficult for her to learn and apply information through a classroom setting, (3) that Martin be in individual therapy in order to improve her

judgment and to help her accept responsibility for the choices she is making. Martin was subsequently seen by a psychiatrist and placed on medication.

The court adjudicated the children dependent-neglected on July 28, 2009, based on Martin's stipulation that her mental issues affected her ability to properly parent her children.[3] DHS filed a petition to terminate Martin's parental rights on June 9, 2010. The termination hearing took place on July 13, 2010.

Lee Wade of the Ozark Guidance Center testified that he was I.P.'s therapist. He stated that I.P. had made some improvements but that his progress was dependent on what was going on in I.P.'s life. Wade opined that I.P. needed stability and permanency in order to begin to truly progress.

Martin acknowledged that her children came into DHS's custody because "they had bruises."[4] She stated that she was present when her father dressed her sons in dresses and spanked them. She said, "I was there when this was happening. I was a witness to this. I was sitting there in shock. I was in shock, how could I stop it when I didn't even understand it." Martin testified that she has a hard time learning. She stated that she "sometimes" struggles with anger. She also said that she struggles with emotional stability and that she gets "stressed out easily." Martin testified that she was currently taking medication. She admitted that when she was not medicated, she behaved erratical-

---

**2.** This is the second time this case is before us. It was first submitted to this court as a no-merit brief. We denied counsel's motion to be relieved and ordered rebriefing in a merit form. *See Martin v. Ark. Dep't of Human Servs.,* 2011 Ark. App. 152, 2011 WL 693340.

**3.** The order was filed on September 22, 2009.

**4.** Martin spent some time in jail for abuse of a minor (her children) in 2009. She was placed on unsupervised probation and assessed fines.

ly.[5] Martin stated that in the summer of 2009, she learned that her ex-boyfriend and stepbrother had committed murder. She reported them in February 2010, some eight months after she learned of their involvement. Martin said that after she reported the murder, she had to "move around quite a bit." According to Martin, she had to leave her home because she "brought a murderer to [her] doorstep." Martin testified that she was disabled and that she received $694 a month. She stated that she was currently living on one side of her parents' (mother and stepfather) house.[6] She also said that her twelve-year-old brother[7] lived with her parents. Martin stated that her brother did not molest N.P., "he more or less just tried new things on him that the neighbors tried on him." She contended that she "caught it, and . . . got him out of the situation." Martin testified that if her children were returned to her, she would continue to live in her parents' home until she found an apartment.

On cross-examination, Martin stated that a portion of her parents' home was "marked off" for her and her things. Martin testified that she takes Dizalproex because she is bipolar, that she takes Trazodone to help her sleep, and that she takes Paroxetine for depression. Martin said that Dr. Dollin placed her on medication in April 2010 and that she has faithfully taken her medicine since that time.

During cross-examination by the attorney ad litem, Martin stated that if her father was to place her sons in dresses and spank them today, she would "take a cast iron after [him]." She testified that it was her, not her father, who usually punished her children. Martin said that she and her children lived with her father even though he had abused her as a child. She testified that she continued to bring her stepbrother and ex-boyfriend to visits with her children after she learned they had committed murder. Martin stated that she stopped taking her medication for a period of about five months because she could not afford it. However, she insisted that she would not come off of her medication again. Martin said that in the future she would turn to her support system (her mother and sister) to help her with the costs of her medication. She stated that her medicines "cost like a dollar." Martin testified that the portion of the house she lives in is separated from the rest of the house by a door. She said that the door does not have a lock but that it "stays shut." According to Martin, no one enters her side of the house unless they knock. Martin said that when she caught her brother and son together with their pants down, she "thought it was kind of normal boy behavior." However, she stated that after the incident, she separated the boys and both were disciplined. Martin said that the boys were still allowed to play together, just not unattended.

On re-cross, Martin stated that she picked up her prescriptions in April, the day after she stormed out of the court hearing. She said that she has not had any more outbursts since she started back taking her medications. She insisted that she had the necessary family support in

5. She stormed out of a staffing at DHS and banged her hand on the side of the building; she stormed out during the middle of a court hearing, after pushing the table; she walked out during a visit with the children in order to "gain [her] composure"; and she threatened to throw away all of the children's toys during another visit.

6. Martin's stepfather had recently been arrested on drug charges at the time of the termination hearing.

7. Martin's brother allegedly molested N.P.

place to help with raising her three children. According to Martin, she completed parenting classes on her own at the Jones Center. She stated that she provided DHS with her certificates as she earned them. At the time of the termination hearing, Martin was signed up for two other parenting classes being offered at the Jones Center. She also stated that she has tried to contact DHS "non-stop" about re-starting some classes there. Martin testified that she used the discipline techniques with her children that she learned in the parenting classes. She stated that she was able to successfully discipline her children with "time-out" at DHS. Dr. Faitak testified that he performed a psychological evaluation on Martin in June 2009. As a result of the evaluation, he diagnosed Martin with attention deficit hyperactivity disorder, learning disabilities, and borderline personality disorder. According to Dr. Faitak, instability is the major characteristic of borderline personality disorder. He also stated that someone with that type of disorder has rapidly changing moods. He said that other characteristics included anger, impulsive behavior, and self-centeredness. Dr. Faitak gave the following opinion:

I think [Martin's] ability to connect is weakened by her low empathy and sensitivity to needs of other people. She's more focused on her own needs, and makes it harder for her to have true empathy for the other person.

I think she has difficulty socializing her children, because of her impulsive behavior, and her judgment issues. She hasn't been a good role model in terms of managing her own emotions, and she's gotten involved with several inappropriate men, and has not demonstrated good judgment that way.

I think her ability to provide for the physical needs is limited by her being on disability. That limits her income greatly, and makes her dependent on other people for housing, and financial support.

I think her borderline personality affects her abilities to deal with problems. It's hard for her to maintain a stable mood, to tolerate frustration, and to be able to negotiate solutions to problems. Her difficulty keeping herself stable underlines all of that. That she's more reactive and impulsive.

Dr. Faitak stated that Martin's erratic behavior, and her testimony that she would take a cast iron after her father, is consistent with borderline personality disorder. He also said that Martin's failure to take her medicine for five months is "a typical borderline thing." He concluded that Martin was still displaying many of the same characteristics of borderline personality disorder.

On cross-examination, Dr. Faitak stated that borderline personality could be overcome if the person stays on his or her medication, stays in therapy, and is aware and acknowledges that there is a problem. On cross by the attorney ad litem, Dr. Faitak said that Martin has more instances of instability than "99 percent of people." He stated that Martin is "more prone to anger, more prone to judgment problems, more prone to paranoia." He admitted that he could not offer an opinion about Martin's "level of psychopathology having any correlation to how well medicines might work for them."

Katherine Jenkins testified that she and her husband were foster parents to D.M., N.P., and I.P. She stated that she has seen a positive change in the children's behavior since they have been kept in a structured environment. Jenkins said that she could tell when the visits with Martin were unstructured because the children's behavior regressed. Jenkins testified that she and

her husband "have considered adopting [the] kids ... should the Court terminate parental rights today."

Stephanie Cochran of DHS testified that the children are adoptable. Cochran stated that Martin was signed up for one-on-one parenting, but it was discontinued because of missed classes and appointments. She said that she was present during some of Martin's visits with her children and that Martin did not demonstrate appropriate parenting skills and techniques. Cochran stated that Martin would yell at the children and respond in a harsh |₈manner. She said that the children would ignore Martin when she attempted to place them in time-out. According to Cochran, DHS recommended termination of parental rights.

On cross-examination, Cochran stated that Martin's parenting classes through DHS were discontinued around February or March. Cochran said that Martin told her about the classes Martin was taking at the Jones Center. According to Cochran, Martin was able to verbalize some of the things she had learned in parenting class. Cochran stated that Martin did some good things but "the visits were very unstructured, and they became very unruly and rowdy."

On cross-examination by the attorney ad litem, Cochran stated that the case initially opened with abuse charges against Martin's father and boyfriend. Martin was subsequently found guilty of "permitting the abuse and not protecting the children." Cochran said that Martin was receiving "typical" parenting classes at DHS; however, Martin was switched to one-on-one parenting following Dr. Faitak's recommendation. Cochran stated that there were some problems in getting Martin to come to the one-on-one classes because it was "during the time she came forward as a witness in the murder trial." According to Cochran, the teacher went to Martin's house "on a few different occasions" but Martin had moved. One-on-one parenting was discontinued because Martin could not be located. Cochran testified that she did not attempt to get Martin back into one-on-one parenting classes because it appeared that Martin was learning from the classes she was taking at the Jones Center. Cochran said that although Martin could verbalize different kinds of parenting skills and |₉techniques, "she's not putting sufficient techniques and skills in action to control these children."

Amelia Brannum testified that she is Martin's sister. She stated that she was the one who took Martin to her parenting classes. According to Brannum, the teacher in the classes "actually does some hands-on with the students." Brannum also stated that Martin is calmer since she started taking her medication.

In its oral ruling, the court conceded that DHS had not complied with the recommendation for one-on-one parenting. Despite this, the court ruled that termination was in the best interests of the children and terminated Martin's parental rights.

In terminating Martin's parental rights, the court found that the children were adoptable and that it was contrary to their best interests to be returned to Martin.[8] The court found at least three statutory grounds for termination: (1) the children had been outside of the home for over twelve months and despite meaningful efforts to correct the problem that caused removal, Martin had been unable or unwilling to correct those problems;[9] (2) the

---

8. Ark.Code Ann. § 9–27–341(b)(3)(A) (Repl. 2009).

9. Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(*a*) (Repl.2009).

children had been outside the home for over twelve months and Martin had willfully failed to provide significant material support in accordance with her means or to maintain meaningful contact with the children; [10] and (3) that there is little likelihood that services to Martin will result in successful reunification.[11] This appeal followed.

 We review cases involving the termination of parental rights de novo.[12] The grounds for termination must be proven by clear and convincing evidence.[13] When the burden of proving a disputed fact is by clear and convincing evidence, the question on appeal is whether the circuit court's finding that the disputed fact was proven by clear and convincing evidence is clearly erroneous, giving due regard to the opportunity of the circuit court to judge the credibility of the witnesses.[14] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[15] A heavy burden is placed on the party seeking the termination of parental rights because it is an extreme remedy in derogation of the natural rights of the parents.[16] Nevertheless, parental rights will not be enforced to the detriment or destruction of the health and well being of the child.[17] Thus, parental rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children.[18]

 Although the court listed three grounds for terminating Martin's parental rights, her appeal only addresses DHS's failure to offer "meaningful reunification services." The other two grounds have not been challenged by Martin. When an appellant fails to attack the trial court's independent, alternative basis for its ruling, we will not reverse.[19]

Affirmed.

ROBBINS and MARTIN, JJ., agree.

---

10. Ark.Code Ann. § 9–27–341(b)(3)(B)(ii) (Repl.2009).

11. Ark.Code Ann. § 9–27–341(b)(3)(B)(ix)(*a* )(3) (Repl.2009).

12. *Grant v. Ark. Dep't of Human Servs.,* 2010 Ark. App. 636, 378 S.W.3d 227.

13. *Id.*

14. *Id.*

15. *Id.*

16. *Id.*

17. *Id.*

18. *Id.*

19. *See Thomsen v. Ark. Dep't of Human Servs.,* 2009 Ark. App. 687, 370 S.W.3d 842.