2011 Ark. App. 642

**Loretta THREADGILL, Appellant**

v.

**ARKANSAS DEP'T OF HUMAN SERVICES, Appellee.**

**No. CA 11–653.**

Court of Appeals of Arkansas.

Oct. 26, 2011.

2. 93 Ark. App. 353, 219 S.W.3d 676 (2005).

3. 84 Ark. App. 194, 138 S.W.3d 112 (2003).

4. 93 Ark. App. 353, 219 S.W.3d 676 (2005).

Deborah Ruth Sallings, Little Rock, for appellant.

Keith L. Chrestman and Tabitha Baertels McNulty, Little Rock, for appellee.

CLIFF HOOFMAN, Judge.

⌊₁Appellant Loretta Threadgill appeals from the order of the Pulaski County Circuit Court terminating her parental rights to her three children, twelve-year-old C.N. and eleven-year-old twins, T.N.1 and T.N.2. On appeal, Threadgill argues that there was insufficient evidence presented to establish by clear and convincing evidence that termination was in her children's best interests. We affirm.

This case first began on September 3, 2009, when the Arkansas Department of Human Services (DHS) received a call from the Pulaski County Sheriff's Department that Threadgill and the children's putative father,[1] Tyrone Nutt, Sr., had

---

1. Tyrone Nutt, Sr., was shown by a paternity test to be the father of T.N.1 and T.N.2. The father of C.N. was not identified during these proceedings. The petition for termination also sought to terminate Nutt's parental rights

been arrested after a drug raid on the home and charged with maintaining a drug premises, possession of a controlled substance with intent to deliver, and endangering the welfare of minors. According to the affidavit attached to the petition for emergency custody, Nutt delivered narcotics to an undercover informant in the home, Threadgill was found with crack cocaine in her possession, and stolen property was found inside the home. The report further stated that the children were sleeping on inflatable mattresses, that there was inadequate food and drink in the home, and that the residence was filthy and infested with roaches.

DHS exercised an emergency hold on the children on September 8, 2009, and probable cause for removal was found at a hearing held on September 15, 2009. The adjudication hearing was held on November 10, 2009, and the trial court found that the children were dependent-neglected and that they had been subjected to aggravated circumstances based upon "an extreme risk of the children being harmed." The court noted that a drug premises poses substantial risks to its inhabitants, including exposure to unsavory visitors and possible violence, as well as to police raids that put the children at risk of harm. Threadgill was ordered to submit to a psychological evaluation and random drug testing. She was also ordered to follow the recommendations of the evaluation, to attend counseling, and to maintain stable housing and income.

A review hearing was held on February 2, 2010, and the goal of reunification was continued, even though the court noted that the results of the psychological evaluations on Threadgill and Nutt were "not encouraging." Threadgill also tested positive for cocaine on her hair-follicle test. The trial court advised the parents that

they had one year in which to pursue reunification with their children and that the "clock is ticking." The court ordered that Threadgill follow the recommendations from her evaluation, which were that she sever her relationship with Nutt and live independently in her own home, complete residential drug treatment, complete parenting classes, participate in individual therapy, and obtain an adequate income.

At the first permanency-planning hearing on July 13, 2010, the court stated that it was "hard pressed to find compelling reasons to continue the goal of reunification but will give the benefit of the doubt to the parents and continue with the current goal" until at least the next hearing, at which time the parents' criminal issues would hopefully be resolved. The court further found that the psychological evaluations indicated that reunification with either parent was a "long shot," although some effort had been made by Threadgill toward compliance with court orders. A second permanency-planning hearing was held on October 5, 2010, and the trial court again continued the goal of reunification, finding that there were compelling reasons to do so because of the children's ages, their behavior, and due to the parents' cooperation with the court and DHS. The trial court did note, however, that the parents still had unresolved criminal charges.

At the third permanency-planning hearing on December 21, 2010, the trial court changed the goal of the case to termination. The court found that Threadgill remained in a relationship with Nutt, who continued to use drugs, had been recently arrested, had unresolved criminal charges, and faced incarceration. The court stated that there were two issues preventing return of the children to Threadgill: a lack of adequate housing and her continued

---

to his two children; however, termination as to him was not addressed at the March 2010

hearing after it was determined that he did not receive notice of the hearing.

relationship with Nutt. The court stated that it was also concerned about the fact that Threadgill's most recent home was "shot up" by a person with a firearm. However, the trial court noted that termination was not a "foregone conclusion," that services would continue to be provided, and that Threadgill had until the next hearing "to step it up" and demonstrate that she had become a fit and appropriate parent.

The petition for termination was filed by DHS on February 16, 2011. It alleged that there were two grounds for termination: (1) the children had been adjudicated dependent-neglected and had remained out of the home for more than twelve months and, despite meaningful efforts by DHS to rehabilitate the home, the conditions had not been remedied; and (2) the parent had subjected the children to aggravated circumstances.

The termination hearing was held on March 15, 2011. Threadgill's therapist, Vicki Lawrence, testified that Threadgill was unable to care for her children without the mental, emotional, and financial support that she continued to seek from Nutt and his family because her family lived out of town. Lawrence also expressed concern about Threadgill's psychological evaluation.

Christy Hilborn, the family's therapist, testified that Threadgill had made progress but that she did not recommend that the children be returned at that time due to Threadgill's recent positive drug test, her instability, and her dependence on Nutt. Hilborn stated that she did not think that more time would result in a successful reunification. She testified that the children had behavioral problems and that their behavior would negatively impact their adoptability. She was concerned that if the children were returned to Threadgill, their behavior problems would continue because of a lack of boundaries by Threadgill, although the children's problems had also persisted in foster care with a relative. She indicated that the current foster parent was unable to continue caring for the children after the end of the school year and that the boys might need residential treatment in the future. Hilborn testified that Threadgill's sister had recently expressed interest in adopting the children, although she would need to be made aware of their behavioral problems.

Tiffany Harper, the DHS caseworker, testified that DHS was recommending termination to provide permanency for the children. Harper stated that Threadgill had recently tested positive for drugs, had ongoing criminal charges, and had recently moved again. Although Threadgill had told Harper that she had no contact with Nutt, she then admitted that she had called him after her recent failed drug test. Harper testified that it was in the best interests of the children for parental rights to be terminated because the case was "not even close" to a possible reunification with Threadgill. Harper testified that she was excited about the possibility of the children's aunt adopting them and indicated that the aunt was a former foster parent who had also adopted her foster child.

Brenda Keith, the adoption specialist, testified that she was familiar with the children and that they were adoptable, although she stated that she might have to recruit a potential family. She stated that she had not produced a list of possible matches for the children at that time.

Threadgill testified that she loved her children and that she wanted them returned to her custody. She stated that she now had a part-time job and that she could support her family. She also testified that she had recently obtained an appropriate home, although DHS had not yet had a chance to inspect it. When

questioned by the trial court about recently testing positive for cocaine, Threadgill testified that she had gone to the dentist and that they had given her a prescription for pain medication but that she did not know the name of it. She stated that she did not knowingly come in contact with cocaine. Threadgill also testified that she had only been in telephone contact with Nutt, although she admitted that she had lied to her caseworker about it. She agreed that it was not a good idea for her to be around Nutt. Threadgill stated that it would be difficult for her children to be adopted by anyone but her sister and that she wanted her sister to be a possible placement if her parental rights were to be terminated. According to Threadgill, she still faced criminal charges in connection with the search of her home in September 2009.

At the conclusion of the hearing, the trial court reviewed the history of the case and made extensive findings. The court found that DHS had proved the grounds for termination by clear and convincing evidence. The court noted that Threadgill was diagnosed with depressive disorder and moderate mental retardation and that the evaluation stated that she was very mentally retarded, with an IQ of 53 and a second-grade academic ability. The evaluation further stated that she had poor judgment and that she had demonstrated little ability to parent her children safely and independently. The trial court found that Threadgill had made efforts to comply with court orders, but that she had only obtained stable housing in the month prior to the hearing and that she was not credible in her claim that she had no relationship with Nutt. The court also found that she did not give a credible explanation for her positive drug test. According to the trial judge, Threadgill might be on the "verge of stability, but it would take ... several months to determine if the gains she's made are going to hold." Therefore,

the court found no compelling reason to give Threadgill more time and that the children needed permanency as quickly as possible. Addressing the issue of adoptability, the court stated that "they may not be the easiest kids to get adopted out, but the point is that further delay only makes that more difficult" as the children get older. The trial court found that it was in the best interests of the children for Threadgill's parental rights to be terminated and for them to be adopted. The termination order was entered on April 7, 2011, and Threadgill has timely appealed from this order.

The rights of natural parents are not to be passed over lightly; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *J.T. v. Arkansas Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). A trial court's order terminating parental rights must be based upon findings proven by clear and convincing evidence. Ark.Code Ann. § 9–27–341(b)(3); *Dinkins v. Arkansas Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Dinkins, supra.* On appeal, the appellate court will not reverse the trial court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the trial court to judge the credibility of witnesses. *Id.*

Pursuant to Ark.Code Ann. § 9–27–341(b)(3) (Repl.2009), an order terminating

parental rights shall be based upon a finding by clear and convincing evidence that it is in the best interest of the juvenile, including consideration of the likelihood of adoption and the potential harm, specifically addressing the effect on the health and safety of the child, caused by continuing contact with the parent. The order terminating parental rights also must be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9–27–341(b)(3)(B).

Threadgill does not challenge the statutory grounds for termination on appeal but only argues that there was insufficient evidence that termination was in the children's best interests; therefore, there is no need to discuss the evidence supporting the trial court's stated grounds for termination. *Welch v. Arkansas Dep't of Human Servs.*, 2010 Ark. App. 798, 378 S.W.3d 290. Specifically, Threadgill contends that there was insufficient evidence presented to establish that the children were adoptable. We disagree.

■ Threadgill admits in her argument that the issue of adoptability of the children need not be proved by clear and convincing evidence. *Renfro v. Arkansas Dep't of Human Servs.*, 2011 Ark. App. 419, 385 S.W.3d 285. Instead, it is merely one of the factors that must be considered by the trial court in its best-interest analysis. *Id.* However, she contends that the evidence in this case as to adoptability was "totally insufficient." Threadgill points to the therapist's testimony that the boys' behavioral problems would negatively impact their adoptability, the caseworker's testimony that the children's current foster parent could no longer cope with them, and the adoption specialist's testimony that she might have to do special recruitment to find potential adoptive families for the children. Given this evidence, Threadgill asserts that the adoption specialist's "unsupported" opinion that the children were adoptable and that it would be possible to find an adoptive home for them is not sufficient. She cites this court's decision in *Grant v. Arkansas Dep't of Human Servs.*, 2010 Ark. App. 636, 378 S.W.3d 227, as support for her argument.

In *Grant*, the adoption specialist opined that the child at issue was adoptable even with a recent diagnosis of autism, because "she believed that all children are adoptable." 2010 Ark. App. 636, at 9, 378 S.W.3d at 231. This court held that, given the insufficient evidence presented as to the likelihood of adoption of the specific child involved in that case and given that the mother had never volitionally subjected the child to harm, the trial court clearly erred in finding that termination of parental rights was in the child's best interest. *Id.*

■ The present case is distinguishable, however, because the adoption specialist in *Grant* did not identify any potential adoptive families for the child, other than an email from a person who might be willing to adopt a child with autism. *Id.* Here, there was evidence that the children's aunt had expressed interest in adopting them, and Threadgill testified that she would like her sister to adopt them if her parental rights were terminated. While the evidence shows that the children have behavioral problems, the adoption specialist nonetheless testified that she believed the children were adoptable. This court affirmed the trial court's best-interest finding under similar facts in *Cobbs v. Arkansas Dep't of Human Servs.*, 87 Ark.App. 188, 189 S.W.3d 487 (2004), where the caseworker testified that the children, even though they were older and had issues to work through, were still adoptable. Therefore, contrary to Threadgill's assertions, there was sufficient testimony presented in this case on the issue of adoptability.

Also, contrary to *Grant, supra*, there was evidence presented here to establish potential harm to the children if returned to their mother. She was found to have subjected the children to aggravated circumstances due to their residence in a drug premises and her involvement in criminal activity. It is true that Threadgill had made some progress in the case, and this was duly noted by the trial court, which declined to change the goal of the case to termination until the third permanency-planning hearing. However, the evidence at the termination hearing established that Threadgill had recently failed a drug test without satisfactory explanation and that she was still facing criminal charges. Threadgill had also maintained contact with Nutt, despite warnings not to do so, and the trial court found her testimony that she was no longer in contact with him not to be credible. In addition, her psychological evaluation indicated that Threadgill had moderate mental retardation and that she had demonstrated little ability to parent her children safely and independently. Although the children had behavioral problems and were in need of further treatment, the family's therapist testified that the behavior would only continue if they were returned to Threadgill because there are no boundaries or limits in her home. Thus, after consideration of the evidence supporting the likelihood of adoption, as well as the potential harm to the children caused by continuing contact with Threadgill, the trial court's finding that it was in the children's best interests for Threadgill's parental rights to be terminated is not clearly erroneous.

Affirmed.

PITTMAN and ABRAMSON, JJ., agree.