Cite as 2020 Ark. App. 272

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CV-19-889

| | |
|---|---|
| SECIA SALINAS | **Opinion Delivered:** April 29, 2020 |
| APPELLANT | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72JV-18-438] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE STACEY ZIMMERMAN, JUDGE |
| APPELLEES | AFFIRMED |

## MEREDITH B. SWITZER, Judge

Secia Salinas appeals from the August 30, 2019 order terminating her parental rights to four of her children: A.F. (born February 27, 2003); M.S.1 (born June 4, 2009); M.S.2 (born March 31, 2013); and S.N.1 (born February 18, 2017).[1] She challenges the sufficiency of the evidence supporting the statutory grounds for termination and the court's finding that termination was in the children's best interest. We affirm.

The Arkansas Department of Human Services' ("DHS's") history with this family dates back to 2012. Over the years, several true findings have resulted from investigations involving inadequate supervision, educational neglect, failure to protect, and sexual abuse.

---

[1]In a separate appeal before this court, *Salinas v. Arkansas Department of Human Services*, 2020 Ark. App. 280 (CV19-890), Salinas challenges the termination of her rights to two other children, C.N. (born October 12, 2018) and S.N.2 (born October 12, 2018). Evidence supporting the termination petitions in these two dockets was heard in the same August 1, 2019 hearing. Salinas's parental rights to all six children were terminated.

On May 15, 2018, three of these four children (A.F., M.S.1, and M.S.2) were taken into seventy-two-hour emergency custody on the basis of a report that M.S.1 had been raped by a juvenile neighbor. She had been sexually abused before by her half brother (G.S.), and a FINS case was opened as a result. Petitions for emergency custody and dependency-neglect followed, and S.N.1 was subsequently added to this case. The circuit court issued probable-cause orders on May 22, 2018, and on July 5, the court adjudicated these four children dependent-neglected. Salinas appealed that decision to this court, and it was affirmed in *Salinas v. Arkansas Department of Human Services*, 2019 Ark. App. 72, 572 S.W.3d 389. The opinion describes the history of this case to that point, making it unnecessary to repeat it in great detail here. We note in particular, however, that we affirmed the circuit court's finding that M.S.1 was dependent-neglected, explaining that the circuit court was presented with evidence that a neighbor witnessed M.S.1 having vaginal and oral sex with L.C. (a juvenile); it was the second time in two years that M.S.1 had been sexually abused while in Salinas's care and custody; following the first abuse incident, the circuit court had directed Salinas to provide "line-of-sight" supervision; and despite that directive and despite the fact Salinas saw "red flags" concerning the juvenile responsible for the second abuse incident, she nevertheless permitted M.S.1 to play with that juvenile unsupervised.

The permanency-planning hearing was held on April 24, 2019. Even though Salinas had completed parts of the case plan, the circuit court changed the goal of the case from reunification to adoption and termination because the circuit court found that Salinas could not properly care for her children, and they had undergone too much trauma to be returned to her.

The termination hearing was held on August 1, 2019. Wesley Goodson, the foster-care therapist who had seen M.S.2 since July 16, 2018, and M.S.1 for a short time since July 11, 2019 (when M.S.1 left Vantage Point), testified about their mental-health diagnoses, the manner in which their mental-health issues manifested themselves, their medications, and the periods of progression and regression they had experienced. She described M.S.2 as having a great personality, very smart, and "a little sassy." She recommended that M.S.2 continue to receive weekly therapy and that she not be placed with her two older siblings, A.F. and M.S.1. She opined that M.S.2 was at a pivotal point in her mental health and had made marked progress over the past year. With respect to M.S.1, Goodson testified that she has a lot of mental-health struggles, and she was still processing the traumas from her past. Goodson described Salinas as nurturing during her visits with M.S.2 but that Salinas struggled with "appropriateness." She gave as an example that Salinas was going to tell M.S.2 about M.S.1's sexual abuse in the context of apologizing to M.S.2.

Lilli Sadinsky, M.S.1's primary therapist at Vantage Point, described and explained M.S.1's diagnoses. She testified that M.S.1 made progress during her treatment, with some minor regression. She explained that M.S.1 disclosed sexual abuse by G.S., L.C., and an uncle. Sadinsky reported that M.S.1 worries about her mother, Salinas, being hurt or killed because she witnessed her stepdad, Samuel Nino, choke Salinas. She also worries that her twin sisters, C.N. and S.N.2, might be sexually abused, too. Sadinsky testified that she last saw M.S.1 around June 2019. She said that M.S.1 needs a lot of continued treatment and work on the trauma, that she needs a lot of support, and that if she could be placed or adopted by a very nurturing and consistent family it would be very helpful to her. Sadinsky

3

reported that M.S.1's progress would deteriorate during periods that coincided with visits from Salinas. She said that during those periods, M.S.1 would not cooperate with treatment, did not disclose a lot of the trauma, disrupted the unit, and engaged in a lot of self-destructive behaviors.

Ivy Le was A.F.'s therapist at Perimeter (formerly Woodridge) from about June 2018 until May 2019. She described A.F. as a very sweet girl with maternal instincts, trying to care for those around her. She said that A.F. worries a lot about Salinas and the younger siblings. Le testified that A.F. would make some progress during treatment (e.g., improving her communication skills and regulating her moods better), and then there would be some regression (generally triggered by court hearings or family sessions). Her recollection was that the family sessions had to be stopped completely. A.F. made disclosures to Le, including one about A.F.'s maltreatment by a brother that required Le to report to the Texas hotline. She said there was a lot of sexual history and the treatment involved trying to find out what happened and putting a timeline together. Le testified that A.F. loves her mom very much and worries about her mother's well-being, but she also worries about whether Salinas is going to take care of them. She stated that A.F. needs a consistent, supportive environment.

Percilla Cothren, a family-service worker, prepared a court report for the hearing that was introduced as an exhibit. She testified that Salinas had not maintained weekly contact with DHS or kept them informed about changes in her address or phone numbers, but she had participated in individual counseling, and submitted to random drug screens, which were always negative. Cothren explained that Salinas had completed parenting classes and had obtained and maintained stable housing, but she had not maintained stable

employment. She testified that there had been major concerns surrounding visits between Salinas and her children. She said that Salinas's visits with M.S.1 and A.F. had to be stopped because the girls experienced such major regression, including severe self-harm, afterward. She explained that visits with M.S.2 also precipitated regressions that included M.S.2's eating out of a trash can, getting in trouble at school, and being defiant toward authority. They "paused" the visits between Salinas and M.S.2, but Wesley Goodson had recently been able to start working on some visits for closure. Cothren explained that Salinas's visits with S.N.2, C.N., and S.N.1 had always been supervised by DHS, and they had never reached a point to recommend unsupervised visits. She said they attempted sibling visits, with the first visit among A.F., M.S.1, and M.S.2. She said that visit also caused major regression in M.S.1 and some regression in M.S.2—not to the same degree as visits with Salinas but it caused "acting out" for several days afterward. She said two visits were also arranged among M.S.1, M.S.2, C.N., S.N.2, and S.N.1.

Cothren testified that since leaving Perimeter/Woodridge in June, A.F. had been living in a foster home that focused on teenage girls. She reported that A.F. had done phenomenally well there with no self-harm or signs of anxiety except for being anxious about starting a new school. M.S.1 was currently in a regular foster home and attempts were being made to place her in a therapeutic foster home. At the time of the hearing, M.S.2 and S.N.2 were living together in a home in Springdale. M.S.2 had lived there for about a year and had done very well aside from the ups and downs that occurred surrounding contact with Salinas. S.N.2 had lived in that home for about two weeks.

Although Samuel Nino had consented to the adoption of his children (C.N., S.N.2, and S.N.1), DHS had also pled involuntary grounds. Cothren testified that Nino had not maintained weekly contact with DHS or informed DHS of changes in his address and phone number. She said he had engaged in some counseling but did not complete it. He did not submit to random drug screens consistently, and she was not sure if he had completed parenting classes. He maintained stable housing and employment. She stated that Nino and Salinas had not demonstrated the ability to protect the children and keep them safe from harm. Nino did not become sober during the case, continuing to abuse alcohol in excess. She testified that domestic violence was an issue in the home, and he did not fully participate in counseling to address those issues. In addition, she said that Salinas continued her relationship and contact with Nino, even after he voluntarily gave up his rights and excused himself from participating in the case.

Cothren explained that the regression caused by Salinas's visits with her older children demonstrated she could not provide the structure and nurturing for them to feel comfortable that they could rely on her to keep them safe. She said Salinas's children worry about her safety as if they were the parent; Salinas's employment had been inconsistent; and DHS did not believe she could adequately care for the children or provide for their extensive therapies, needs, and structure. She said that DHS had provided services through protective-services and FINS cases and offered all measures of support to this family with no results. She said closure visits were not recommended between Salinas and A.F. or M.S.1, but that such visits were recommended between Salinas and M.S.2, S.N.2, C.N., and S.N.1. Cothren testified that all four children were adoptable. She stated that none of the children

have special medical needs or concerns that would prevent them from being adopted. Specifically, regarding A.F., Cothren testified that she was able to bond with others and form relationships, and was doing very well.

Salinas testified that she began working in the food-service department at Washington Regional Medical Center the day before the hearing, and before that she had been employed at McDonald's. She described her living arrangements and said there was enough space for the children. She acknowledged she had not been consistent in maintaining contact with DHS because she had begun to feel it was pointless. She stated that she had been participating in individual counseling and believed she had made progress. She had worked with the therapists about decision-making in relationship choices and on her co-dependency with Mr. Nino. She stated that she had seen Nino twice since the last hearing in April. She completed parenting classes. The last time she saw A.F. was in December, M.S.1 in November, M.S.2 on the Monday preceding the hearing, and the three youngest children (S.N.1 and the twins, C.N. and S.N.2) on that Tuesday. She described her visits with the three youngest children as "good" and "happy" and involving interaction and play. She said that visits with M.S.2 occur in therapy and that M.S.2 avoided hard questions dealing with big feelings. She expressed her belief that she could keep her children safe even though everybody made it sound as if she could not. She explained that her idea of protecting the children meant not having any relationship with any of their abusers, concentrating on them and not trying to get into another relationship herself, continuing therapy, making the home safe, and taking them to all their appointments. Salinas stated that if it were up to her, she would take her three oldest children home and

let another family adopt the three youngest. Her main concern was that the three oldest children would be bounced around in foster care. With respect to the adoptability of her three oldest children, she said she understood there were trained families, but she did not feel as if they could have the same patience with her children as she could; she thought it would be hard for someone else to be patient with them because they had experienced a lot of trauma.

The attorney ad litem questioned Salinas about the incident M.S.1 witnessed in which Samuel Nino choked her, Sandinsky's testimony about M.S.1's worrying about Salinas being hurt or killed because of witnessing the incident, and the fact that Salinas had still been in contact with Nino. Salinas said the choking incident was a one-time incident, and she did not feel like her life was at risk when she had recently called him for a ride.

The hearing concluded after testimony that is not pertinent to this appeal was presented and closing statements were made. The attorney ad litem concurred with DHS and recommended the termination of Salinas's parental rights. In its termination order, the circuit court found that DHS had proved by clear and convincing evidence three statutory grounds for termination—"failure to remedy," "subsequent factors," and "aggravated circumstances"—and that it was in the children's best interest to terminate Salinas's parental rights.

We review termination-of-parental-rights cases de novo. *Phillips v. Arkansas Dep't of Human Servs.*, 2020 Ark. App. 169, 596 S.W.3d 91. An order forever terminating parental rights must be based on a finding by clear and convincing evidence that termination is in the children's best interest. *Id.* The circuit court must consider the likelihood that the

8

children will be adopted if the parent's rights are terminated and the potential harm that could be caused if the children are returned to a parent. *Id*. The circuit court must also find by clear and convincing evidence one or more grounds for termination. *Id*.

Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction of the allegation sought to be established. *Tovias v. Arkansas Dep't of Human Servs.*, 2020 Ark. App. 147, 596 S.W.3d 66. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id*. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id*. Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Id*. As with all issues addressing child placement, the appellate court affords heightened deference to the circuit court's superior position to observe the parties personally and weigh credibility. *Id*. The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. *Phillips*, *supra*.

I. *Statutory Grounds*

The circuit court found by clear and convincing evidence three statutory grounds for termination: (1) failure to remedy (Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)* (Supp.

9

2019)); (2) subsequent factors (Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*; and (3) aggravated circumstances (Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A) & (B)(i)*). Proof of only one statutory ground is sufficient to support a termination. *Wright v. Arkansas Dep't of Human Servs.*, 2019 Ark. App. 263, 576 S.W.3d 537.

Salinas challenges the circuit court's aggravated-circumstances finding, which was based on her inability to demonstrate that she was capable of keeping her children safe and, in part, on her continued relationship with Samuel Nino. She argues that she was in compliance with the substantive requirements of the case plan because she had a house, employment, and transportation; she was participating in services and had made progress in therapy; and she was committed to working through the older three children's mental-health issues. She also asserted that she realized she needed to cease all contact with the children's abusers and avoid new relationships of her own in order to protect her children. We are not persuaded that the circuit court clearly erred.

In finding DHS had proved aggravated circumstances, the circuit court supported its decision by noting that DHS had been involved with the family for an extensive period and that Salinas had consistently shown she was not capable of safely parenting her children despite having received appropriate family services. The circuit court recounted DHS's history with Salinas since September 2016. As mentioned previously, that history included investigations that resulted in true findings for inadequate supervision, educational neglect, failure to protect, and sexual abuse—all for which DHS provided appropriate services. The circuit court explained that what matters most is whether completion of the case plan achieves the intended result of making the parent capable of caring for the child. Salinas had

10

participated in family services throughout the case, and despite those services, she had consistently shown in this case and in past protective-services cases that she was not capable of keeping her children safe and ensuring their mental-health needs were addressed. The circuit court concluded that, given the family's history with DHS, and Salinas's decision to continue her relationship with Nino, there was little likelihood that continued family services would result in successful reunification.

We are not left with a definite and firm conviction that the circuit court made a mistake in finding that DHS proved the statutory ground of aggravated circumstances, which exists when "[a] juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification." Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A) & (B)(i)*. Salinas's history with DHS has been long, the services provided numerous, and the results meager. Her visits with her older children resulted in them regressing in their therapy and had to be stopped. She was never able to achieve unsupervised visits with her younger children. Her employment was not stable, and she did not maintain consistent contact with DHS. Despite the trauma and fears suffered by at least one of her children, who witnessed Nino choking Salinas, she continued to have contact with Nino, excusing his domestic violence as an isolated incident. As explained by the circuit court, completion of the case plan is not determinative. *McDaniel v. Arkansas Dep't of Human Servs.*, 2013 Ark. App. 263. What matters is whether completion of the case plan achieved the intended result of making a parent capable of caring for the child. *Id.* The circuit court concluded that Salinas was not

capable of caring for her children and that there was little likelihood further services to the family would result in successful reunification. We hold that the circuit court's finding is not clearly erroneous. Because we affirm the court's finding of aggravated circumstances, it is unnecessary to address the remaining two statutory grounds found by the circuit court.

## II. *Best Interest*

In addition to finding one or more statutory grounds for termination, a circuit court must also find that it is in the children's best interest to terminate parental rights. The best-interest determination must demonstrate that the circuit court considered the likelihood the children would be adopted if parental rights were terminated and the potential harm that could be caused if the children were returned to a parent. *Barton v. Arkansas Dep't of Human Servs.*, 2019 Ark. App. 239, 576 S.W.3d 59.

Here, the circuit court considered both adoptability and potential harm, but Salinas challenges only the adoptability finding, and only with respect to A.F., M.S.1, and M.S.2. Salinas does not believe the three older children could ever achieve permanency through adoption because they suffer from mental-health issues and no family could show them the patience they need as much as she could. She fears they will bounce around in foster care, and she argues that the caseworker's testimony that there were no barriers to the girls' adoptability was insufficient because she did not mention the regression and mental-health issues discussed by the therapist. We disagree.

As the circuit court explained:

> Specifically, the testimony of Percilla Cothren is that each of the children are very adoptable, with no special medical or behavioral needs that would prevent them from being adopted. The Court has explored the issue of adoptability and finds that each of the children are very adoptable.

Salinas relies on *Grant v. Arkansas Department of Human Services*, 2010 Ark. App. 636, 378 S.W.3d 227, to support her argument that the caseworker was not specific enough in explaining adoptability in light of the girls' mental-health issues. The testimony in *Grant* that our court found insufficient, however, was a generic statement that "all children are adoptable," in a situation where the child suffered from autism, and he was attached to a loving mother who had never volitionally subjected him to harm.

Here, in contrast, Salinas's relationship with her children was troubled at best, and the caseworker explained that A.F. is adoptable because she has no medical needs that might prevent her from being adopted, she is able to bond with others and can form relationships, and she is doing very well. Similarly, she testified that neither M.S.1 nor M.S.2 has special medical needs or any concerns that might inhibit them from being adopted. The caseworker's comments were addressed specifically to each of the three girls for whom Salinas challenges the adoptability finding. A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Phillips*, *supra*. There is no requirement that an adoption specialist testify at the termination hearing or that the process of permanent placement be completed at the time of the termination hearing. *Id*. Evidence that adoptive parents have been found is not required, and neither is evidence that proves the child will be adopted. *Id*. Our review of the record in this case convinces us the circuit court did not clearly err in finding that the termination of Salinas's parental rights was in these children's best interest.

Affirmed.

GRUBER, C.J., and HIXSON, J., agree.

13

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor children.