LARRY D. VAUGHT, Judge
Jennifer Wright appeals the order entered by the Sebastian County Circuit Court terminating her parental rights to three of her children, BW (born April 11, 2003), AW (born May 31, 2005), and EW (born June 30, 2007). On appeal, Wright contends that the circuit court clearly erred in finding that statutory grounds supported termination and that termination was in her children's best interest. We affirm.
On September 13, 2015, the Arkansas Department of Human Services (DHS) exercised a seventy-two-hour hold on Wright's four children-JR (born December 30, 2000), BW, AW, and EW[1] -based on allegations that Wright slapped JR in the face during an argument about a lack of food in the home. DHS filed a petition for emergency custody alleging that the juveniles were dependent-neglected due to abuse, neglect, and parental unfitness. The affidavit of a DHS caseworker accompanying the petition stated that there was very little food in the home, Wright admitted striking JR, Wright was arrested for *540 third-degree domestic assault, and she admitted using marijuana. The circuit court entered an ex parte order of emergency custody.
Following an adjudication hearing, the circuit court found that the children were dependent-neglected due to neglect and parental unfitness. The circuit court continued the custody of the children with DHS and established reunification as the goal of the case. Wright was ordered to maintain stable housing, income, and transportation; complete parenting classes; complete a drug-and-alcohol assessment and follow any recommendations from that assessment; submit to random drug screens; resolve her criminal issues; visit the children regularly; and take her medication as directed.
Review-hearing orders were entered in December 2015 and May and August 2016. In these orders, the circuit court found that Wright was complying with the case plan in that she had maintained stable housing, income, and transportation; completed parenting classes; visited BW, AW, and EW; submitted to random drug testing and two hair-follicle tests; resolved her criminal issues; and attended a psychological evaluation. She was ordered to take her medications, continue counseling, and obtain her driver's license. In these orders, DHS was found to have made reasonable efforts to achieve the goal of reunification by referring Wright for a psychological evaluation and a drug-and-alcohol assessment; referring the children for counseling and PACE evaluations; and providing clothing vouchers, transportation, medical services, and visitation. Reunification remained the goal of the case.
A permanency-planning order was entered by the court on September 27, 2016, wherein the court found that Wright had a home, income, and transportation; completed parenting classes; attended a drug-and-alcohol assessment; attended group therapy; and submitted to drug screens. The court further found that Wright needed to obtain a driver's license, continue group therapy, visit the children, take her medication as directed, and continue participating in JR's therapy. The court stated that Wright needed budgeting assistance and ordered DHS to assist with that need.
In December 2016, DHS recommended that Wright have a trial home placement with BW, AW, and EW. In February 2017, the circuit court entered a fifteen-month review order wherein the court found that Wright had housing, income, a driver's license, and transportation; tested negative on drug screens; and completed parenting classes and a drug-and-alcohol assessment. Wright was directed to participate in counseling with JR as recommended and obtain tags for her vehicle. DHS was ordered to assist with obtaining Wright's medication. Reunification remained the goal of the case, but the court also found that concurrent planning in the form of Another Planned Permanent Living Arrangement (APPLA) was appropriate for JR. The circuit court found that DHS had made reasonable efforts to finalize a permanency plan for BW, AW, and EW.
In an April 2017 review order, the circuit court ended the trial home placement of AW because of concerns about AW's behavior and the risks it posed for both her and Wright if AW remained in the home. The court found that AW and JR should continue in the custody of DHS but that BW and EW would remain in Wright's custody. The circuit court determined the case goal was "family preservation" for BW and EW, reunification for AW, and APPLA for JR. The court found that DHS had made reasonable efforts with the services and that Wright was in compliance with the case plan because she had a driver's license, transportation, income, *541 and housing. However, the court noted that "it would like to see more stable housing and income long term."
In July 2017, the circuit court entered a second permanency-planning order finding Wright had legal custody of BW and EW, but the children's aunt, Vicky Granlun, had physical custody of them because Wright did not have housing. JR and AW were ordered to remain in the custody of DHS. The goal of the case remained the same, and DHS was found to have made reasonable efforts to provide family services to achieve the goal of reunification, including the additional services of a trial home placement, home visits, and homemaking services.
In October 2017, the circuit court entered a review order finding that Wright did not have stable housing, income, or transportation. The court continued legal custody of BW and EW with Wright but gave Granlun physical custody of them. The circuit court also found that DHS had made reasonable efforts to achieve permanency goals and APPLA. The court ordered sibling counseling with the addition of Wright and Granlun as recommended by the children's therapist.
On November 16, DHS filed a second emergency petition alleging that on November 13, the children's uncle, Franklin Victor Richardson, had slapped BW in the face twice. Richardson was arrested and charged with third-degree domestic battery. DHS alleged Granlun was advised at a November 9 staffing that Richardson, along with two other men, should not be in the home with BW and EW; all three men were in the home in the week leading up to the November 13 incident; and Granlun failed to protect BW and EW. The circuit court entered an emergency order returning BW and EW to foster care.
In a combined probable-cause and review order entered on November 28, the circuit court continued the children in foster care and found that the goal of the case for JR would continue to be APPLA but that adoption and permanent custody with a relative was the appropriate goal for BW, AW, and EW. The court further found that Wright did not have stable housing, income, or transportation and had outstanding criminal issues, which included fines.
In January 2018, the circuit court entered an adjudication order finding that BW and EW were dependent-neglected based on Granlun's inadequate supervision and Wright's lack of adequate housing. The goal was adoption and permanent custody for all four children with APPLA as an additional goal for JR. On April 9, DHS filed a petition for termination of Wright's parental rights to all four children. DHS alleged that termination was in the best interest of the children and that termination was warranted under the subsequent-factors ground, Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)(a) (Supp. 2017), and the aggravated-circumstances ground, Arkansas Code Annotated section 9-27-341(b)(3)(B)(ix)(a)(3)(A) & (B)(i) .
At the onset of the termination hearing, DHS withdrew its request to terminate Wright's parental rights to JR and proceeded to terminate Wright's parental rights to BW, AW, and EW. Wright testified first, stating that since January 2018, she had been living in a three-bedroom apartment. She acknowledged that during the case, she had lived in eleven homes. She explained that she moved to better her situation but did not have the financial security to maintain a home throughout the case. Wright also testified that she had eight jobs during the case. She said that she lost some of those jobs and that she took other jobs to make more money. She stated that at the time of the termination *542 hearing, she was employed at OK Foods and had been working there for six months. Wright also conceded that during the case she did not have transportation for five months but that she had a car at the time of the termination hearing. She added that her driver's license has been suspended three or four times because of unpaid fines, but it was no longer suspended, and she was current on all her driving-related fines.[2]
Wright stated that she was not enrolled in counseling and had "mostly" forgotten to take her Prozac during the case. She also said that she never tested positive for drugs during this case and that she regularly visited with EW. She had not visited the older children in a year because their therapist did not recommend it. Wright testified that it was unfair to say her relationship with her children deteriorated during the case when she had not been able to visit them. Wright stated that she did not want her parental rights terminated and that she wanted all four children returned to her home. She said that she was ready for EW to be placed in her home on the day of the hearing.
Natosha Lowery, Wright's DHS caseworker from October 27, 2015, to December 1, 2016, testified that Wright's primary problem was a lack of stability. DHS provided services to Wright, and in December 2016, Lowery recommended a trial placement with BW, AW, and EW. According to Lowery, JR was not part of the trial placement because she did not want to visit her mother.
Tehrina Means, Wright's caseworker from December 2016 to March 2018, testified that when the trial placement started, Wright had a home, a job, and transportation. According to Means, things deteriorated during the placement. AW had issues in Wright's home, and the court ended her placement. Then Wright changed jobs, changed cars, got behind on rent, and moved. She did not take the children to their counseling appointments, and she did not attend her counseling appointments. Means stated that she learned that BW, AW, and EW were living with different relatives and did not know where Wright was living. DHS stepped in and placed the children with Granlun. However, that arrangement ended in November 2017 when BW was slapped in the face by Richardson in Granlun's home. Means further testified that she did not recommend another trial placement with Wright due to her instability and the older children's refusal to live with Wright. Means said that EW was the only child who wanted to see Wright.
Savannah Robinson, Wright's current caseworker, testified that DHS's primary concern is Wright's lack of stability. Robinson stated that there has been a clear pattern of Wright's achieving stability in housing, employment, transportation, and paying the bills, but she is unable to maintain it, which causes emotional and physical stress on the children. Robinson said that the longest Wright has been able to sustain stability is six months and that the failed trial placement is an example of her concern. Robinson testified that because of Wright's history, she does not consider Wright's having the same housing, employment, and transportation for six months evidence of stability.
Robinson acknowledged that EW wants to visit her mother and that they *543 have a bond; however, Robinson stated that the risk of harm to EW outweighed the benefit of maintaining the relationship. Robinson said that because of Wright's history, she did not believe Wright could parent EW and that the stress of instability on EW would be harmful to her. Robinson stated that JR, BW, and AW do not want to visit or work out their problems with their mother. Robinson also testified that the children are adoptable. She said that they are a "handful" but that they are sweet and do not have any medical issues.
BW, AW, and EW's therapist, Sheryle Hollingshead, testified that the children do not reflect positively on their childhood, they have suffered emotional trauma due to their "chaotic upbringing," and AW and EW have nightmares about things they experienced with their mom. Hollingshead stated that EW reported that she wanted to live with her mother but added, "I know that if I go and live with my mom eventually we're not going to have any electricity, we're not going to have food, and we're not going to have the things that we need." Hollingshead testified that BW and AW do not want to live with their mom, and she did not force them to visit Wright or have family therapy with her because they were "adamant" that they did not want it.
CASA volunteer Ruth Dudding testified that she has concerns about Wright's instability because she had multiple jobs and homes during the case. Dudding testified that six months is not an extended time to demonstrate stability considering that Wright was caring only for herself during that time. Dudding added that when Wright had stability before the trial home placement, it fell apart when the children were returned to her custody.
At the conclusion of the hearing, the circuit court granted DHS's termination petition. On September 28, 2018, the circuit court entered an order finding that termination was supported by the aggravated-circumstances ground and was in the best interest of BW, AW, and EW. This appeal followed.
Termination-of-parental-rights cases are reviewed de novo. Pine v. Ark. Dep't of Human Servs. , 2010 Ark. App. 781, at 9, 379 S.W.3d 703, 708. Grounds for termination of parental rights must be proved by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. Id. , 379 S.W.3d at 708. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. Id. , 379 S.W.3d at 708. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Id. , 379 S.W.3d at 708. In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses. Id. , 379 S.W.3d at 708. Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. Id. , 379 S.W.3d at 708. As with all issues when addressing child placement, the appellate court affords heightened deference to the circuit court's superior position to observe the parties personally and to weigh credibility. Dinkins v. Ark. Dep't of Human Servs. , 344 Ark. 207, 215, 40 S.W.3d 286, 292-93 (2001).
Pursuant to Arkansas Code Annotated section 9-27-341(b)(3), an order forever terminating parental rights shall be based on a finding by clear and convincing evidence that it is in the best interest *544 of the child, including consideration of the likelihood that the child will be adopted if the termination petition is granted and the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A). The order must also find by clear and convincing evidence one or more grounds. Ark. Code Ann. § 9-27-341(b)(3)(B). Proof of only one statutory ground is sufficient to terminate parental rights. Hooks v. Ark. Dep't of Human Servs. , 2017 Ark. App. 687, at 11, 536 S.W.3d 666, 673.
The circuit court found that the aggravated-circumstances ground supported its termination decision. In this case, aggravated circumstances means that a determination has been made by a court that there is little likelihood that services to the family will result in successful reunification. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a)(3)(A) & (B)(i) . This type of aggravated circumstance occurs when a parent is not following through with offers of assistance, is not completing basic goals of the case plan, and there is a lack of significant progress on the parent's part. Aday v. Ark. Dep't of Human Servs. , 2010 Ark. App. 677, at 4, 2010 WL 3902438.
In support of its aggravated-circumstances finding, the circuit court acknowledged that Wright experienced "brief periods of stability" but found that her case had been open for thirty-four months and that she was "incapable of long[-]term stability, which is what these children need." The court cited evidence that during this case Wright had lived in ten locations, had eight jobs, was unemployed for periods of time, and had eight contempt violations for failure to pay fines from 2016 to 2018. The court also referred to the failed trial placement in which Wright did not take the children to counseling, lost her housing, gave custody of her children to relatives, left town, and did not stay in contact with DHS.
On appeal, Wright argues that this is insufficient evidence to support the aggravated-circumstances finding. We disagree. As pointed out by the circuit court, there was ample evidence of Wright's persistent instability throughout this case. Wright testified that she lived in eleven places, had eight jobs, and owned six vehicles. She admitted that there were times she was unemployed during the case, lacked transportation, and did not have a valid driver's license. The record demonstrates that she had eight contempt violations for failure to pay fines, she failed to pay rent, and she failed to pay utilities. Wright's failed trial placement is a direct result of her inability to sustain stability.
Additional evidence showed that there is little likelihood that further services would result in reunification. Wright failed to attend counseling, to regularly take her medication, and to take her children to counseling during the trial home placement. Counseling and visitation with Wright are not options for BW and AW because they refuse to attend. Dudding testified that because of Wright's history, she would not be able to maintain housing, employment, and transportation if she was given custody of EW.
Wright calls into question the circuit court's conclusion that she lacked stability because the court's own orders demonstrate that she maintained stability for twenty-three of the thirty-four months. It is true that Wright had sixteen months of stability prior to the trial home placement, but when BW, AW, and EW were returned to her custody, Wright lost that stability. While she has maintained her current housing and employment for six months, the circuit court found this was *545 not the stability her children need, and this finding is supported by the testimony of Robinson and Dudding, who both stated that they did not place significance on Wright's current stability because she could not sustain it. This court has repeatedly held that the children's "need for permanency and stability will override [a parent's] eleventh-hour efforts." Gonzalez v. Ark. Dep't of Human Servs. , 2018 Ark. App. 425, at 11, 555 S.W.3d 915, 921.
Wright offers various explanations for the multiple moves and jobs; however, it is for the circuit court to weigh the evidence and determine the validity of the explanations. We will not substitute our judgment for that of the circuit court in matters of weighing the evidence. Garlington v. Ark. Dep't of Human Servs. , 2018 Ark. App. 124, at 9, 542 S.W.3d 917, 922.
Finally, Wright argues that "DHS did very little in the way of offering services to address [her] housing and financial instability during the case." She argues that she would have benefited from family counseling and could have secured housing sooner if DHS had provided the HUD letter before November 2017.[3] However, a finding of aggravated circumstances does not require DHS to prove that meaningful services toward reunification were provided. Willis v. Ark. Dep't of Human Servs. , 2017 Ark. App. 559, at 9, 538 S.W.3d 842, 849.
In sum, the evidence establishes that DHS offered services to Wright for nearly three years; yet she has not demonstrated that she can sustain stable housing, employment, and transportation. A stable home is one of a child's most basic needs. Selsor v. Ark. Dep't of Human Servs. , 2017 Ark. App. 182, at 6, 516 S.W.3d 314, 318. Accordingly, we hold that the circuit court did not clearly err in finding that Wright had subjected her children to aggravated circumstances, meaning that there is little likelihood that services to the family will result in successful reunification.
Wright also challenges the circuit court's finding that termination was in the best interest of the children. There is no merit to this argument.
The circuit court found that BW, AW, and EW are adoptable, and Robinson's testimony supports this finding. A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. Miller v. Ark. Dep't of Humans Servs. , 2016 Ark. App. 239, at 8, 492 S.W.3d 113, 118. Moreover, Hollingshead, BW, AW, and EW's therapist, testified that the children had no therapeutic needs that would prevent adoption, that the children's behavior and emotional states were improving in their current foster placements, and that she believed the children would be open to adoption even if they were adopted by separate families, as long as they were happy and stable. This evidence supports the circuit court's adoptability finding. Stanley v. Ark. Dep't of Human Servs. , 2016 Ark. App. 581, at 10, 507 S.W.3d 544, 551.
The circuit court also found that the children would be at risk of potential harm-physical and emotional-if returned to Wright's custody. The same evidence that supports the aggravated-circumstances ground also supports the potential-harm prong of the circuit court's best-interest finding. Robinson said that all three children would be at risk of harm if returned to Wright because of her lack of stability and the family stress it causes. BW was battered due to Wright's instability. Hollingshead testified in detail about *546 the emotional trauma suffered by the children due to Wright's instability and "chaotic upbringing." Hollingshead stated that the girls do not reflect positively on their childhood, they have behavioral issues and emotional problems caused by the instability, and AW and EW have nightmares. Both AW and BW refuse to visit Wright (and have not visited with her in a year) or attend family counseling with her. Although EW reported that she wanted to live with her mom, she acknowledged that eventually they would not have electricity, food, and other things they need. Dudding opined that Wright would not be able to maintain stability with custody of only EW. Finally, a failed trial home placement may be considered evidence of potential harm. Gonzalez , 2018 Ark. App. 425, at 13, 555 S.W.3d at 922.
Further, the evidence disputes Wright's argument that DHS failed to provide services to reunify the children with Wright. According to Lowery, DHS offered many services to Wright that resulted in the trial home placement. During the placement, when Wright lost her home and her job and gave custody of the children to a relative, DHS did not seek to end the placement; rather, DHS continued to offer services to the children, to Granlun, and to Wright. When the trial placement did end, DHS provided further services to Wright and the children. The service that Wright seems to focus on is the family therapy; however, the evidence is clear that Hollingshead did not recommend it because BW and AW refused to attend.
This court has stated time and again that a failure to provide appropriate housing is contrary to the best interest of children. Selsor , 2017 Ark. App. 182, at 6, 516 S.W.3d at 318 (citations omitted). A stable home is one of a child's most basic needs, and that cannot be ignored. Id. , 516 S.W.3d at 318. The evidence established that Wright has failed to demonstrate stable housing, employment, and transportation and that her persistent, all-encompassing instability has been physically and emotionally traumatic to the children. A court may consider past behavior as a predictor of likely potential harm should the child be returned to the parent's care and custody. Gonzalez , 2018 Ark. App. 425, at 13, 555 S.W.3d at 921-22. Accordingly, we hold that the circuit court did not clearly err in finding that the children were at risk of potential harm if returned to Wright's custody.
Affirmed.
Abramson and Gladwin, JJ., agree.

The putative and legal fathers of the children are not parties to this appeal.

The record reflects that during this case Wright had received eight citations for failing to pay fines, three citations for no liability insurance, two citations for driving on a suspended license, one citation for failure to register her vehicle, and one citation for failing to wear a seat belt.

The evidence reveals that Lowery gave Wright a HUD letter before December 2016.