Cite as 2019 Ark. App. 342

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CV-19-147

|  |  |
|---|---|
| MELANIE BLASINGAME AND DANIEL BLASINGAME<br><br>APPELLANTS<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><br>APPELLEES | OPINION DELIVERED: AUGUST 28, 2019<br><br>APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT<br>[NO. 66FJV-15-443]<br><br>HONORABLE LEIGH ZUERKER, JUDGE<br><br>AFFIRMED |

## ROBERT J. GLADWIN, Judge

Appellants Melanie Blasingame and Daniel Blasingame appeal the November 20, 2018 order of the Sebastian County Circuit Court terminating their parental rights to their five minor children, R.B., C.B., N.B., J.B., and D.B. Appellants challenge the sufficiency of the evidence supporting the respective termination of parental rights (TPR). We affirm.

I. *Facts and Procedural History*

This case began on September 4, 2015, when a detective with the Fort Smith Police Department investigated an allegation of sexual abuse at appellants' residence involving one of the minor children, J.B., and another individual unrelated to J.B., namely Robert Brumley, who was also residing in the home. It was determined that Brumley had sexually abused J.B. while Melanie, Daniel, and Brumley were in the home using illegal and/or controlled substances. Melanie admitted that she and Daniel had been using drugs with

Brumley before the incident occurred, and the investigator for the Arkansas Department of Human Services (DHS) reported that Melanie appeared to be under the influence at the time of the children's removal. As a result of the investigation, DHS exercised a seventy-two-hour hold on the children.

DHS filed a petition for emergency custody and dependency-neglect on September 8, and the attached affidavit disclosed a prior true finding on Melanie for "Presence of an Illegal Substance in a Child or Its Mother at the Time of Birth Resulting from the Mother's Knowing Use of the Substance." The court entered its ex parte order for emergency custody on the same day.

A probable-cause hearing was held on September 15, after which the court found that probable cause existed for the children to remain in the custody of DHS based on the stipulation of the parties. It was ordered that the parents' visitation would be separate and apart from one another. An adjudication hearing was held on October 13. By stipulation of the parties, the court adjudicated the children dependent-neglected because Melanie and Daniel abused them

> by exposing them to a threat of harm and neglected [them] by inadequately supervising them, each based on the parents doing illegal drugs with [Brumley], who subsequently sexually abused [J.B.] while [Melanie and Daniel] were under the influence of illegal drugs in the home. The acts and omissions of [Melanie and Daniel] therefore placed [the children] at a substantial risk of serious harm.

The court set the goal of the case as reunification and ordered Melanie and Daniel to obtain and maintain stable and appropriate housing, income, and transportation; complete parenting classes; complete drug-and-alcohol assessments and all recommended treatment;

2

submit to drug screens as requested by DHS; complete domestic-violence classes; and visit regularly. The order was not appealed.

A review hearing was held on February 2, 2016. Daniel did not appear but was represented by counsel, and the resulting order contains no findings related to him. Services that DHS had been providing to Melanie included domestic-violence classes, drug-and-alcohol assessments, parenting classes, drug screens, and hair-follicle testing. The court found that Melanie had either completed or was complying with the case plan and court orders and continued the goal of reunification. On March 23, a trial home placement was implemented with the children returning to Melanie's care.

The next review hearing was held on May 24. Daniel attended that hearing with counsel, having been transported from the Ouachita River Correctional Unit. The court placed custody of the children with Melanie following a successful trial home placement that began on March 23 and changed the goal of the case to family preservation. The court did so despite Melanie's having recently lost her job, noting that she needed to obtain a new one soon. The court noted that Daniel was incarcerated and ordered him to complete everything he could while there, including a psychological evaluation if offered by the prison. The court further ordered DHS to hold a staffing for Daniel on his release and allowed him supervised visitation at DHS. The court stated that Melanie was to ensure that Daniel have no contact with the children outside of authorized visitation at DHS.

A permanency-planning hearing took place on October 20, 2016. The resulting order reflected that Daniel was present with his attorney, presumably no longer incarcerated. Custody of the children remained with Melanie, and she was ordered to submit to a hair-

3

follicle test. Daniel was ordered to complete a psychological evaluation. His visitation remained as previously ordered, with no contact with the children outside of the arranged visitations at DHS.

On November 16, DHS filed a motion for ex parte emergency change of custody, alleging that it had received a report that Melanie had allowed Daniel to spend the night on several occasions in contravention of the court's orders regarding Daniel's contact with the children. Melanie and Daniel admitted that Daniel had been to Melanie's home that day to install a wood-burning stove because the home did not have heat, but they denied any contact between them other than that isolated instance. The court found that Melanie and Daniel had disregarded the no-contact order, specifically finding that Daniel had been to the home with the children to install a wood stove, treat the children's hair for lice, spend the night on several occasions, and help move the family to their current home. The court entered its emergency change-of-custody order on November 16, placing the children back into DHS's custody and setting an emergency hearing for November 17. At the November 17 hearing, which Daniel did not attend, the parties reached an agreement to return custody of the children to Melanie. The court ordered Daniel to have no contact whatsoever with the children outside of scheduled visitation at DHS and reminded Melanie that she was responsible for ensuring compliance with the court's order.

Another review hearing occurred on January 19, 2017, at which time custody of the children remained with Melanie, who was authorized to supervise Daniel's visitation in a public setting. The court ordered Daniel to complete the psychological evaluation and to resolve any criminal issues.

On May 4, a review hearing was held, but Daniel was not present. The court continued the children in Melanie's custody with the goal of family preservation but noted that Melanie did not have income and had not had income for the last six months. Moreover, Melanie did not have operable and insured transportation and had yet to complete domestic-violence classes. Additionally, Daniel's visitation was changed back to supervised visitation at DHS.

The second permanency-planning hearing took place on August 24, and the children remained in Melanie's custody with the continued goal of family preservation. Melanie was ordered to seek counseling for J.B. The court noted that Daniel had been reincarcerated and ordered that he have no contact with the children outside of visits arranged by DHS, with those visits remaining supervised upon his release.

On November 30, the court held a review hearing and continued custody with Melanie along with the goal of family preservation. However, the court found that although Melanie had housing, she was behind on her rent, lacked stable income and stable transportation, and had not followed through on obtaining counseling for J.B. The court acknowledged the attorney ad litem's request to remove the children from Melanie's custody and warned Melanie that the court was close to removing the children. The court ordered DHS to hold a staffing within two weeks and expected Daniel to be provided with a psychological evaluation by that time. The court ordered Daniel to submit to a hair-follicle drug screen, as well as regular drug screens, and left visitation to be supervised at DHS.

On December 13, 2017, the ad litem filed a motion for emergency hearing to suspend Daniel's visits, which was followed by DHS's filing a motion for ex parte emergency

change of custody on December 19. Both motions were based on an incident of domestic violence between Daniel and Melanie wherein Daniel had kicked the door in at Melanie's home, after which Melanie (1) fled with the children to a shelter in Oklahoma; (2) had nowhere to reside; and (3) failed to inform DHS, the attorney ad litem, or the Court Appointed Special Advocate (CASA) about the incident. Also, DHS's motion revealed that at the staffing held December 18, Daniel admitted he had previously resided with Melanie and the children during the case; purposely evaded the police; and lied to the police, CASA, and DHS either directly or indirectly to cover for Melanie in order to keep the children in her custody. DHS asserted that Melanie did not have housing, income, or transportation; had not arranged counseling for J.B.; and had not been truthful with DHS or the court about her contact with Daniel or his contact with the children.

The court entered its emergency change-of-custody order the same day placing the children in DHS custody with a hearing on the merits scheduled for December 27. At that hearing, the court found that it was contrary to the welfare of the children to be returned to Melanie's custody, and it thus continued custody with DHS.

At the review hearing on February 8, 2018, custody of the children remained with DHS with the goal of the case changing to adoption after TPR. The court ordered both parents to obtain and maintain stable and appropriate housing, income, and transportation; submit to a psychological evaluation; participate in homemaker services; and visit regularly. Daniel was ordered to complete anger-management classes and resolve his criminal issues, and Melanie was ordered to complete domestic-violence classes. The court set a hearing on a prospective TPR petition for May 31 that was continued without objection to July 5.

DHS filed a TPR petition on June 1, 2018, asserting that Melanie's and Daniel's parental rights should be terminated on two grounds: (1) they manifested the incapacity or indifference to remedy/subsequent factors that arose after the inception of the case pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)*(a)* (Supp. 2017); and (2) they subjected the children to aggravated circumstances based on little likelihood of successful reunification pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(ix)*(a)(3)(B)*. On June 25, the court suspended Daniel's visits until the TPR hearing due to his behavior.

On July 5, the court began the TPR hearing and continued the hearing to August 3 to complete the presentation of evidence. However, on July 5, the court modified the previous visitation order to allow Daniel supervised visitation with the children at an organization called "STEPS." Daniel was ordered not to say anything inappropriate to Melanie, the children, or anyone else involved in facilitating the visitation. His visitation was restored pursuant to an order modifying visitation that was entered on July 16.

On July 26, Daniel filed a petition for citation of contempt and for a finding of no reasonable efforts, alleging that DHS had not complied with the visitation at STEPS despite Daniel's contacting DHS and emails being exchanged between the parties' counsel. The ad litem responded that Daniel had not followed the court's orders regarding his behavior toward others and that upon completing the intake appointment at STEPS, he proceeded to curse at Department of Children and Family Services (DCFS) staff and at Melanie as she attempted to get into her vehicle. The ad litem asked that Daniel's visits be suspended pending a hearing. Likewise, DHS filed a response explaining the alleged sequence of events and stating that Daniel's behavior had not improved. The court entered an order to appear

7

and held a hearing on the petition for contempt, finding that Daniel's counsel made an oral request to dismiss the petition after the parties discovered that DHS had the discretion to determine proper visitation, and thus there was no violation of that discretion.

Although the TPR hearing spanned four days—July 5, August 3, and September 6–7, 2018—Daniel testified only on the initial day of the hearing. He failed to appear for the remaining days of the TPR hearing, but his counsel appeared and continued to represent him. Daniel noted that he was living with his parents but had spent seventeen months—approximately half of the case—incarcerated. He had been arrested and incarcerated three times over the course of the case, the most recent a few weeks before the TPR hearing for disorderly conduct, resisting arrest, and fleeing—all misdemeanor charges. He acknowledged that there was a no-offensive-contact order entered against him with respect to Melanie that had been in place for two years and that he was currently under a six-year suspended sentence for a fleeing charge that he had just pled guilty to in January. He noted that he was no longer on parole.

As to services, Daniel reiterated that he was incarcerated throughout most of the case but had completed anger-management classes five times while in prison. He acknowledged that he did not complete his psychological evaluation after having been asked to return to redo one part and that he had made admissions in staffings that demonstrated he had violated the court's orders regarding living with and having contact with Melanie and the children. He said he was aware he was not supposed to be living with Melanie and the children but that he did it anyway because "that's my family . . . and I feel like there's supposed to be a

line between my duty to the government and their involvement in my personal life." He said he had not lived with Melanie and the children since December 2017.

Daniel explained that he was paying his criminal fines in multiple courts but would have no remaining balance within two months. He said his visits go "well," but he blamed DHS for its negligence in not facilitating visitation as required. He recalled the most recent visit when the transporter, DCFS program assistant Richard Most, did not bring all the children, and he and Most became crossways with each other—with Daniel telling Most that he would "beat his ass." He said he would not have carried through with the threat even if his boys had not been present even though "everything called for it," and he acknowledged that he had a temper. He stated that he believed that DHS had been derelict in keeping in contact with him and asserted that he could not get a return phone call or text. He felt his candidness at staffings was being unfairly used against him.

Dr. Robert Spray testified regarding the psychological evaluations of Daniel and Melanie. As noted earlier, Daniel's evaluation was not complete because one of the tests was invalid. Despite Daniel's not returning to retake that portion of the evaluation, Dr. Spray diagnosed Daniel with antisocial personality disorder, opioid and cannabis use in sustained remission, and unspecified anxiety disorder. Dr. Spray concluded that Daniel has average intelligence and that while he was defensive with self-report measures and was unwilling to admit to common faults that most people endorse, the portion of his testing that was valid did not point to any areas of concern regarding parenting. Dr. Spray recommended parenting classes and supervised visits but only because he was under the impression that

9

there were some domestic-violence issues and could not recommend anything else under those circumstances.

On August 3, 2018, Richard Most testified regarding the visit during which Daniel threatened battery against him. He said Daniel followed him to his truck, and while he was buckling in the children, Daniel dropped the items in his hands and began to verbally abuse Most. Most got into the truck, and Daniel attempted to open the door several times, yelling at Most through the window. Most described another incident that occurred just before the TPR hearing when Daniel was verbally abusive to Most and to Melanie during a visit at STEPS, which drove Melanie to tears and required Most and another male to walk Melanie to her car to ensure her safety. Most said he would continue to supervise Daniel's visits but that he was fearful of Daniel.

Melanie testified that Daniel appeared at her place of employment—Taco Bell—five times despite having been banned from the premises. She explained that he was arrested during one of those incidents just weeks before the TPR hearing. She described the incident in December 2017 in which Daniel kicked in the door to enter her home and left her a note telling her he had been there. She said that he had visited two days earlier and spit in her face because she refused to sign insurance papers. Melanie said that Daniel had attempted forced entry at a previous home and that she had to call the police, causing him to flee and to be shot at by police with a Taser. She said domestic violence had been an issue since before they were married eleven years ago.

She discussed the night the children were picked up by DHS, stating that Daniel had been out of prison for just over a week and had brought drugs into the home. She believed

10

that he was on methamphetamine a few weeks prior to the TPR hearing when he verbally assaulted her at STEPS, noting that he was skinny and that his face had been "picked up."

Melanie described Daniel as a "bully" and said that he "stalked" her wherever she went. She did not think he had any remorse for the things he did and believed he would return to prison if he was caught on pending warrants. She noted that while he continued to call her, he had not had physical contact with her since the previous hearing; he had not appeared at her place of employment; and he had not attempted to contact her through third parties. Further, while she believed voicemail messages he had left were threatening, she did not describe the content. She said that she had turned the messages to the prosecutor's office but that no charges had been filed.

The CASA volunteer, Burt Kelly, testified about his assessment of Daniel and described voicemails he had heard. Kelly acknowledged that he told Daniel he did not believe he was a "bad guy." He further stated that he had said a lot of things to Daniel that would make Daniel mad but that Daniel had never threatened him. He said Melanie and Daniel do not get along, but he had no knowledge of Daniel's ever being violent with the children.

Likewise, Alyson Burt, the caseworker previously assigned to the case, testified about Daniel saying that she did not have a lot of "huge issues" with him, that he was passive-aggressive and said things that made her think he was covertly threatening her, but that he would primarily just rant and was able to contain himself.

Natosha Lowery, the current caseworker, discussed the potential harm to the children if placed in Daniel's care and said there was an "extremely high risk for physical

harm" because of all the "fits that's [sic] been indicated" and his "noncompliance to remedy the fact that he has aggressive behavior." She further noted his legal issues and the fact that he was not present in court.

On September 7, 2018, at the close of all evidence and arguments, the court took the matter under advisement. Also on that day, the court held a permanency-planning hearing and took the goal for permanency planning under advisement.

On November 20, the court issued a written TPR order terminating both Daniel's and Melanie's parental rights on the subsequent-factors ground and the aggravated-circumstances ground. Moreover, the court specifically found it was in the children; best interest to terminate parental rights:

> The Court finds it is in the best interests of [R.B., C.B., N.B., J.B., and D.B.] to terminate parental rights. In making this finding, the court specifically considered [their] need for permanency, the likelihood that [they] will be adopted if the [TPR] petition is granted, and the potential harm to [them] that would be caused by returning [them] to [Melanie, Daniel, or both].
>
> a. As to [R.B., C.B., N.B., J.B., and D.B.'s] adoptability, the Court specifically finds that adoption for each of these children is likely. The caseworker testified that the children are healthy, bright children with no medical problems and no bars to adoption.
>
> b. As to potential harm, the Court specifically finds there is a substantial risk of harm to all five children if they were returned to [Melanie] at this time. The risk is both physical and emotional due to instability. There is an extreme risk of harm if [R.B., C.B., N.B., J.B., and D.B.] were returned to or had continued contact with [Daniel].

Melanie and Daniel filed timely notices of appeal on December 6, 2018.

II. *Standard of Review and Applicable Law*

We reiterated our standard of review in *Wright v. Arkansas Department of Human Services*, 2019 Ark. App. 263, at 9, 576 S.W.3d 537, 543:

12

Termination-of-parental-rights cases are reviewed de novo. Grounds for termination of parental rights must be proved by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses. Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. As with all issues when addressing child placement, the appellate court affords heightened deference to the circuit court's superior position to observe the parties personally and to weigh credibility.

(Citations omitted.)

Pursuant to Arkansas Code Annotated section 9-27-341(b)(3), an order forever terminating parental rights shall be based on a finding by clear and convincing evidence that it is in the best interest of the child, including consideration of the likelihood that the child will be adopted if the termination petition is granted and the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A). The order must also find by clear and convincing evidence one or more statutory grounds. Ark. Code Ann. § 9-27-341(b)(3)(B). Proof of only one statutory ground is sufficient to terminate parental rights. *Wright*, *supra*.

### III. *Daniel's Appeal*

Daniel does not challenge the court's determination that statutory grounds existed for TPR under section 9-27-341(b)(3)(B). But he notes that DHS continued to carry the burden of proving that TPR was in the children's best interest—a finding that must be made

13

separate and apart from any existing statutory grounds. Daniel submits that the record lacks sufficient evidence regarding the potential-harm element to support the court's finding that TPR was in the children's best interest.

Daniel acknowledges his propensity for aggressive behavior, but he claims that the evidence demonstrates, at most, that (1) he and Melanie do not get along; (2) he has a propensity to be "mouthy"; (3) he has difficulty refraining from contacting Melanie; and (4) he continues to have legal issues. Daniel urges that these issues are insufficient to support a permanent severance of his relationship with his children. He claims that these bases do not demonstrate, as the court found, that there is an "extreme risk" of harm to the children if they continued to have contact with him.

We disagree and note that the same evidence that supports the uncontested grounds also supports the potential-harm prong of the circuit court's best-interest finding. *See Kohlman v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 164, 544 S.W.3d 595; *Miller v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 396, 525 S.W.3d 48. "In considering potential harm caused by returning the child to the parent, the circuit court is not required to find that actual harm would result or affirmatively identify a potential harm." *Gonzalez v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 425, at 12, 555 S.W.3d, 915, 921. "Potential harm must be viewed in a forward-looking manner and in broad terms, including the harm the child suffers from the lack of stability the child receives in a permanent home." *Id.* Past behavior may be considered as a predictor of likely potential harm should the child be returned to the parent's care and custody. *Id.*

The record reveals Daniel has a history of domestic violence against Melanie that dates to at least 2011 when she obtained an order of protection against him. *McDaniel v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 263, at 5 (holding that a history of domestic violence indicates potential harm). Melanie testified that Daniel had "anger issues" and "violent tendencies" and recounted incidents during the case when Daniel had spit in her face, kicked in the door to her home, left threatening messages on her phone, and jumped into her car. The CASA volunteer testified that Daniel's "propensity to anger and violence" was an issue throughout the case and that Daniel had admitted that he had been abusive toward Melanie in the past.

The record indicates Daniel conceded he had a propensity for violence through his own testimony. Regarding his child's abuser, Daniel testified, "That's what I did wrong was not do what I should have done then. I should have taken him down the damn river and buried him . . . ." Daniel also testified about an encounter with a DHS worker who facilitated visitation. When the caseworker ended Daniel's visit after his refusal to abide by the court's orders—even after redirection—Daniel became irate, verbally abusing the worker and threatening to harm him, all in the presence of his children. Daniel admitted, "I told him that I would beat his ass, and I didn't because my boys were there, and that's the only reason I didn't . . . but everything called for it." Moreover, despite completing anger-management classes five times while in prison, Daniel testified that "anger management doesn't teach you anything, but trips to prison will."

Daniel's multiple incarcerations throughout the case also support the court's finding of potential harm. *See Kohlman*, 2018 Ark. App. 164, at 11, 544 S.W.3d at 601 (holding that

15

appellant's history of violence and resulting incarcerations are factors weighing in favor of the court's finding that the children would be at serious risk of harm if returned to his custody). Daniel was arrested three times and spent approximately seventeen months of the case incarcerated.

At the time of the TPR hearing, Daniel acknowledged that he had a six-year suspended sentence for fleeing that he pled to in January 2018. Daniel is also facing charges for violation of a domestic-protection order, fleeing, disorderly conduct, resisting arrest, and domestic battery in the second degree. A petition to revoke his suspended sentence had been filed.

Moreover, Daniel failed to comply with the case plan and court orders. *L.W. v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 44, 380 S.W.3d 489 (stating failure to comply with court orders can show potential harm). The court ordered Daniel to maintain stable and appropriate housing, income, and transportation; complete parenting classes; complete a drug-and-alcohol assessment and recommended treatment; have no contact with his children outside of scheduled visitations; submit to drug screens as requested by DHS; complete domestic-violence classes; visit regularly; resolve any criminal issues; complete anger-management training; and complete a psychological evaluation.

Daniel failed to address his anger-management and domestic-violence issues, never completed his psychological evaluation, failed to visit his children regularly, and failed to resolve his legal problems. Moreover, there is no evidence in the record that Daniel completed parenting classes or a drug-and-alcohol assessment or submitted to any drug screens. Daniel violated the court's order regarding visitation by having contact with the

16

children outside of his designated visitation. Daniel's repeated incarcerations throughout the case failed to demonstrate any semblance of stability.

Given this evidence, the court's potential-harm finding against Daniel was not clearly erroneous. *Painter v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 602 (affirming best-interest finding when appellant did not live a law-abiding life). Although Daniel testified about his post prison progress, his testimony was uncorroborated, and the circuit court, as the fact-finder, was not required to believe Daniel's self-serving testimony. *Tankersley v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 109, 389 S.W.3d 96.

IV. *Melanie's Appeal*

A. Statutory Grounds Supporting TPR

Melanie argues that the court clearly erred in terminating her parental rights pursuant to the "subsequent factors" ground found in section 9-27-341(b)(3)(B)(vii)*(a)*. We disagree and hold that the court's finding was not clearly erroneous. First, Melanie failed to follow the court's orders. Throughout the case, Melanie failed to show that she can maintain stability in housing, employment, transportation, or finances, which was enough to support TPR based on the subsequent-factors ground. *See Gonzalez*, 2018 Ark. App. 425, at 9, 555 S.W.3d at 920 (failure to comply with court orders can serve as a subsequent factor on which TPR can be based); *See also Rivera v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 405, 558 S.W.3d 876. Her failure to follow the orders designed to achieve reunification demonstrated an incapacity or indifference to remedy the subsequent factor. *See Myers v. Ark. Dep't of Human Servs.*, 2011 Ark. 182, 380 S.W.3d 906.

Additionally, the court made repeated findings that DHS had provided reasonable family services. *See Miller*, 2017 Ark. App. 396, at 14, 525 S.W.3d at 57. Melanie failed to object to these findings and did not argue at the TPR hearing that reasonable efforts to provide family services were not made by DHS. Even on appeal, Melanie does not argue that DHS did not make reasonable efforts to offer family services. *See Benedict v. Ark. Dep't of Human Servs.*, 96 Ark. App. 395, 242 S.W.3d 305 (2006) (declining to address matters beyond those raised by appellant). Accordingly, the court's subsequent-factors finding against Melanie was not clearly erroneous.

Because only one statutory ground must be proved to support termination of parental rights, we do not address the other statutory ground found by the circuit court. Ark. Code Ann. § 9-27-341(b)(3)(B).

### B. Best-Interest Determination

Melanie claims that it was clearly erroneous for the court to find that it was in the children's best interest to terminate her parental rights given how long the children were in her physical care and custody throughout the case. The children were returned to Melanie's physical custody for a trial home placement in March 2016 with legal custody being returned to her in May 2016. The children remained in Melanie's physical custody for twenty-one months—two-thirds of the case—until DHS obtained emergency custody in December 2017 following the incident involving Daniel's breaking in to Melanie's residence. Melanie claims that the children want to be with her. DCFS program assistant Most noted that Melanie was always appropriate with the children when he supervised the visits, noting that

18

Melanie was able to handle all five children. While DHS canceled three or four of Melanie's visits since January 2018, she had not missed a single visit with the children.

Melanie submits that the court unfairly allowed Daniel's inappropriate behavior to affect her portion of the case and to support its best-interest finding against her. She argues that Daniel's outlandish conduct should not be imputed to her when she took all the appropriate steps to protect herself and her children.

Finally, Melanie cites *Bunch v. Arkansas Department of Human Services*, 2017 Ark. App. 374, 523 S.W.3d 913, as support for the proposition that a parent's lack of financial means is not a sufficient basis to terminate parental rights. As in *Bunch*, Melanie claims the overarching issue that she faced was a lack of financial means. Melanie submits that her financial struggles were not a revelation to the court as of the initial commencement of the TPR proceeding on July 5, 2018. She challenges the basis for TPR—her financial struggles throughout the case—because at the conclusion of the proceedings in September 2018, her finances had improved.

We disagree and hold that the circuit court's best-interest determination with respect to Melanie is not clearly erroneous. Although Melanie challenges the court's best-interest finding, she does not specifically contest either the adoptability prong or the potential-harm prong of the best-interest analysis. Thus, this court need not review those findings. *Isbell v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 110, at 11, 513 S.W.3d 19, 26.

Nevertheless, the caseworker testified that the children are adoptable and—taking into consideration that the children are a sibling group of five—there are no significant reasons why they would not be adoptable. The caseworker testified that none of the children

has outstanding medical issues or extreme treatment needs. This evidence was sufficient to support the court's consideration of adoptability in its best-interest finding.

Moreover, the court's potential-harm finding was well supported by the evidence as discussed above. *See Kohlman, supra.* Evidence of Melanie's instability was sufficient to support the court's potential-harm finding. *See Vail v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 150, 486 S.W.3d 229 (stating financial, relationship, and housing instability support a finding of potential harm). And "a parent's failure to comply with court orders itself is sufficient evidence of potential harm." *Gonzalez*, 2018 Ark. App. 425, at 12–13, 555 S.W.3d at 921–22.

Melanie's failure to comply with the court's orders resulted in two placement failures. Eight months after this case began, the court returned the children to Melanie's custody and ordered her "to ensure that [Daniel] has no contact with the [children] outside the contact at [DHS]." Six months later, DHS discovered that Melanie had been violating the court's order:

> [DHS] asked for police assistance in checking the home. The children told FSW Means that [Daniel's] truck was parked in the backyard at the time of the pickup and that he left out the back door when he saw the police arrive. The children stated that [Daniel] had spent the night on several occasions, been over to help treat the kids' hair for head lice and had assisted in moving the family to the new home.

The court changed custody back to DHS. However, the court gave Melanie a third chance, accepting the parties' stipulation and returning the children to her custody, reiterating that Melanie was to ensure that Daniel was to have no contact with the children:

> [Daniel] is not to have any contact, whatsoever, with the children outside of scheduled visitation at [DHS]. If [Daniel] is needed to provide assistance with the maintenance of [Melanie's] home, no children may be present. Any violation of this

20

order could result in the immediate removal of the children. [Melanie] is also responsible for ensuring the compliance with this order.

The court ordered that its prior orders, which included an order that Melanie obtain and maintain stable and appropriate housing, remained "in full force and effect."

Thirteen months later, DHS learned that Melanie had continued to violate court orders by failing to provide stable housing and by failing to ensure that Daniel had no contact with the children:

> Since [the circuit court returned custody to Melanie for the second time], [she] is now homeless again. The home where she resided at the last hearing was without electricity or water and looked as if it had been ransacked when FSW Burt attempted to view the home and the children on Friday, December 8, 2017. FSW could not locate the family at first and later discovered that Melanie took the children to her mother's home and then to a shelter in Poteau, OK.
>
> . . . .
>
> During the course of the staffing, [Daniel] admitted that on November 14, 2016, when [DHS] picked up the children from [Melanie], he was in fact living with [her]. [Daniel] also gave details of how many times he has purposefully evaded the police, joking about how long the response time for Crawford County has been. He admitted that he has lied to the police, CASA, and [DHS] either directly or indirectly by purposefully withholding information and told "half-truths" in order to cover for Melanie and keep the children in her custody.
>
> At this time, [Melanie] does not have housing, income, transportation, has not obtained counseling arrangements for [J.B.], and has not been truthful with [DHS] or the Court as to her contact with Daniel or his contact with the children.

For the third time during this case, the court ordered the removal of the children from Melanie's custody. She demonstrated that despite having the children in her care for a period of more than twenty months—through a trial home placement and eventually reinstatement of legal custody—she was ultimately incapable of meeting her children's needs.

21

Given Melanie's court-order violations, history of instability, and failed trial placements, the circuit court's best-interest finding against her was not clearly erroneous. *Knight v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 602, 533 S.W.3d 592.

Affirmed.

VAUGHT and BROWN, JJ., agree.

*Lightle, Raney, Streit & Streit, LLP*, by: *Jonathan R. Streit*, for appellant Melanie Blasingame.

*Leah Lanford*, Arkansas Public Defender Commission, for appellant Daniel Blasingame.

*Callie Corbyn*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.